446 P.2d 11

**CHESIN CONSTRUCTION CO., Inc.,
an Arizona corporation, Appellant,**

v.

**Albert EPSTEIN, Appellee.**

**No. 2 CA–CIV 553.**

Court of Appeals of Arizona.

Oct. 23, 1968.

Rehearing Denied Nov. 22, 1968.

Review Denied Dec. 24, 1968.

Lesher, Scruggs, Rucker, Kimble & Lindamood, by Robert O. Lesher, Tucson, for appellant.

Quigley & Lamont, by Daniel K. Lamont, Tucson, for appellee.

MOLLOY, Judge.

This litigation arises out of an accident in the construction industry. It raises the question of whether a general contractor is liable for injuries to an employee of a subcontractor caused by improper work procedures practiced by the subcontractor when the only fault of the general contractor was failure to properly supervise.

The job in question was a commercial building being built under contract with the owner by the defendant Chesin Construction Company. Chesin had subcontracted substantially all of the work to various specialty contractors. Among the twelve subcontracts was a lump-sum contract for carpentry labor entered into between Chesin and Steve Demenge, who was the employer of the plaintiff Epstein.

Under the written subcontract, all work was to be performed under the "direct

supervision" of Chesin but the subcontractor was to " * * * assume full responsibility for the proper location of the work and performance thereof, and shall at all times maintain adequate and competent supervision on the project." The subcontractor was to provide his own tools and equipment, and to carry Workmen's Compensation Insurance on all of his employees. An additional provision on safety measures reads:

"During the course of construction, Sub-Contractor shall be responsible to see that all safety measures shall be employed to guard against injury to persons or property on the premises."

Testimony at the trial indicated that Chesin's supervisory employees considered that they had the authority to stop the work of the subcontractors if they observed any dangerous practices being followed. A Chesin supervisory employee opined that "all superintendents look after the overall safety of a job." The superintendent had, according to this same witness, the authority " * * * to direct the subcontractors in the order of the performance of their work."

The plaintiff Epstein was a journeyman carpenter, who, together with three other employees of Demenge, and Demenge himself, was employed on the day of the accident in installing certain prefabricated wooden trusses which were to form the skeletal structure for the roof of the building. These trusses were designed to span the 40-foot width of the structure. Each truss was in the shape of an isosceles triangle with the base being 40-feet long and the two equilateral sides coming together in the center at three feet and nine inches above the base, thus creating the supporting structure for a two-pitched roof sloping each way from the center. These trusses were constructed of lumber with a thickness of one and five-eighths inches, and in their overall length were somewhat flexible until secured in place by appropriate bracing.

The trusses were being set, according to plans, at two-foot intervals along the length of the building and about thirty of them had been set in place when the accident occurred. As each truss was set in place, it was fastened at its base to a wood plate running along the top of the wall on each side and the tops of each truss were joined together with a "ribbon" of one-inch lumber nailed into each truss by one eight-penny nail. This was temporary construction bracing which would be removed when the permanent bracing called for by the plans was installed. The installation of this "ribbon" material was the responsibility of the plaintiff Epstein. While he was in the center of one of the trusses performing this work, one of the trusses fell over and caused a domino effect on a number of the other trusses. At least two of the trusses fell to the cement floor and six or more of the trusses inverted and were hanging upside down from the walls. Epstein was seriously injured and a substantial verdict in his favor was rendered in the lower court against Chesin, from which an appeal is here taken.

There is no evidence in the record that Chesin, through its employees, interfered in any manner with the work of the carpentry subcontractor, or, gave the subcontractor instruction how to install these braces, or that it failed in any way in its contractual obligation to provide suitable material for the carpentry work. Neither is there any showing that this accident resulted from a scheduling of work by Chesin nor by reason of any other affirmative action taken by Chesin or any of the other subcontractors under its supervision. The sole contention of liability is based upon the failure of Chesin to properly supervise and to prevent the particular method used by the carpentry subcontractor in the installation of these trusses.

There is ample evidence in the record, though it is disputed, that the method used in bracing the trusses during construction was inadequate and not in accordance with standard practices. Additionally, a journeyman carpenter who was employed by Chesin

at the time of this accident as its superintendent testified that he was aware of the method being used to brace these trusses during construction and that, in his opinion, the bracing was "inadequate" and "unsafe." At the same time, however, the superintendent refused to characterize the situation as "dangerous" and expressed the opinion that though he might have done the work in a different manner, he did not consider that he had authority to order the carpentry subcontractor to install additional braces. The carpentry subcontractor testified that, if the superintendent had ordered him to use additional bracing in this installation, he would not have done so because the superintendent's authority was limited to directing him to comply with plans and specifications. The plans did not specify what type of construction bracing would be used. The carpentry subcontractor blamed the accident on the plaintiff's failure to nail the top "ribbon" properly.

Additionally supportive of the verdict is testimony of Chesin's superintendent that he overheard the plaintiff request additional bracing on the trusses, which request was refused or ignored by the carpentry foreman. The plaintiff himself testified as to such a request on two occasions during the installation, which request in each case was directed to the carpentry foreman who had responded that additional bracing was not needed.

The plaintiff has not contested that the contract between Chesin and Demenge created an independent contractor status, but the contention is advanced that Chesin retained sufficient control over this work so that a jury's verdict of liability must be upheld. The principal reliance of the plaintiff is upon the Restatement (Second) of Torts § 414:

"One who entrusts work to an independent contractor, but who retains *the control of any part of the work,* is subject to liability for physical harm to others

for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." (Emphasis added)

Restatement (Second) of Torts § 414, at 387.

For reversal, the appellant has advanced arguments revolving around statutory provisions pertaining to the Workmen's Compensation Act[1] and the contention that there is insufficient evidence of control over the work of the subcontractor to sustain a verdict against the general contractor. We consider the latter contention first because we consider it dispositive.

■ Generally, the employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the subcontractor. McGuire v. Valley National Bank of Phoenix, 94 Ariz. 50, 381 P.2d 588 (1963); Restatement (Second) of Torts § 409, at 370. There are several well-recognized exceptions to this rule and we are here concerned with the exception pertaining to retained control.

■ Though the written contract is not conclusive as between these parties, Arizona-Hercules Copper Co. v. Crenshaw, 21 Ariz. 15, 184 P. 996 (1919), we first examine it to determine whether it provides evidence of retained control sufficient to impose liability. The provision that "[a]ll work to be completed * * * shall be done under direct supervision of Contractor's representative * * *" is the only one in the contract granting a control, the non-exercise of which may have had a causal relationship to this accident.

It is first to be noted that the control retained by this language, whatever it may be, pertains to "all" phases of the work, not "any part of the work." If the language is given such construction, so as to vest in the contractor the authority to control the methods to be used in obtaining results, one of the appellant's statutory arguments

---

1. A.R.S. §§ 23–902, 23–1021, 23–1022, 23–1023, as amended, and 23–1024.

comes into play, for A.R.S. § 23–902, subsec. B provides:

"B. When an employer procures work to be done for him by a contractor over whose work he retains supervision or control, and such work is a part or process in the trade or business of the employer, then such contractors and the persons employed by him, and his sub-contractor and persons employed by the sub-contractor, are, within the meaning of this section, employees of the original employer."

And, A.R.S. § 23–1022, subsec. A provides, in part:

"The right to recover compensation pursuant to the provisions of this chapter for injuries sustained by an employee shall be the exclusive remedy against the employer * * *"

■ Our Supreme Court has regarded immunities granted by the Workmen's Compensation Act to be destructive of the "jurisdiction" of the superior court in a personal injury case. S. H. Kress & Co. v. Superior Court of Maricopa County, 66 Ariz. 67, 72, 182 P.2d 931, 934 (1947), and see State ex rel. Industrial Commission v. Pressley, 74 Ariz. 412, 417, 250 P.2d 992, 995 (1952).

But we find no need to rule upon this defense, because we find the language of this contract to be an insufficient retention of control to constitute Chesin as the plaintiff's employer under this statutory language.

Our Supreme Court in its consideration of A.R.S. § 23–902, has substantially equated the control contemplated therein with the common law test of an independent contractor status. Industrial Commission v. Navajo County, 64 Ariz. 172, 177–178, 167 P.2d 113, 115–116 (1946), and cases cited therein, and see Industrial Commission v. Farm and Home Food Service, Inc., 5 Ariz.App. 339, 426 P.2d 808 (1967).

Here, we believe the language used, when construed in setting, that is, in a contract for the performance of a part of the work of a construction project, is not intended to vest control " ' * * * over the method of reaching a certain result * * * ' " but rather to retain control over " ' * * * the result reached, leaving the method to the other party * * * ' "[2]

That it is not uncommon to provide for a right of supervision in the general contractor and that this does not destroy the normal shield from liability is indicated by many court decisions, among which is Moore v. Phillips, 197 Ark. 131, 120 S.W. 2d 722 (1938). This decision collates a goodly number of decisions rendered to that date, and the following pronouncement is made:

"There are countless decisions of appellate courts construing stipulations in contracts, such as here involved, relating to the right of the owner 'to give directions'—'orders' and 'instructions' regarding the work as it progresses; and phrases such as 'in accordance with instructions'—'as directed'—'In such manner as shall be directed'—'under supervision of owner's agent, as he may direct'—and 'under the direction and supervision', are frequently construed. In all of the cases examined, some of which are cited, it is held that such phrases do not relate to the method or manner and do not govern the details or the physical means by which the work is to be performed. The Supreme Court of the United States has so held in two cases directly in point. Casement v. Brown, 148 U.S. 615, 13 S.Ct. 672, 37 L.Ed. 582; United States v. Driscoll 96 U.S. 421, 24 L.Ed. 847."
120 S.W.2d at 727.

More recent decisions adopt this same view: Wallach v. United States, 291 F.2d 69 (2d Cir. 1961); Gallagher v. United States Lines Co., 206 F.2d 177 (2d Cir.

**2.** Industrial Commission v. Navajo County, 64 Ariz. 178, 167 P.2d 116, quoting from United States Fidelity & Guaranty Co. v. Industrial Commission, 42 Ariz. 422, 429, 26 P.2d 1012, 1015 (1933).

1953), cert. denied 346 U.S. 897, 74 S.Ct. 221, 98 L.Ed. 398 (1953); Walker v. Wittenberg, Delony & Davidson, Inc., 241 Ark. 525, 412 S.W.2d 621 (1966), on rehearing 242 Ark. 97, 412 S.W.2d 621, 626 (1967); Bedford v. Bechtel Corp., 172 Cal.App.2d 401, 342 P.2d 495 (1959); Potter v. City of Kenosha, 268 Wis. 361, 68 N.W.2d 4 (1955).

All of the above-cited opinions are in the area of construction contracts. None of these deals specifically with the words "direct supervision," but words of substantially equal authority are involved. For instance, in *Bedford,* the following provision was construed:

> "All work shall be subject to general supervision and inspection by Constructor, which may exercise such control of the work as required to safeguard the interests of the Company.
>
> \*   \*   \*   \*   \*   \*
>
> "'(c) To enforce the intent of these specifications, the Constructor may require the Contractor to install additional safeguards and observe such special safety precautions as appear to be necessary.'"

342 P.2d at 497.

In *Wallach,* the contract provided:

"All work shall be done *under the supervision of* the authorized Government Representative *in charge of the work* at the site." (Emphasis added)

291 F.2d at 70.

In *Potter,* the contractor had furnished a bond which provided that the work be performed "'\* \* \* under the directtion of the City Engineer and to the approval and acceptance of the City Manager.'" 68 N.W.2d at 7.

In *Gallagher,* the contract provided that the work would be done "'\* \* \* in the order directed by and manner satisfactory to the Owner'" and that the contractor would "'\* \* \* use such equipment *approved by the Owner* as is best adapted for the proper and safe handling of the cargo \* \* \*'" (Emphasis in Court's opinion.) 206 F.2d at 179.

In the only opinion coming to our attention dealing directly with the words "direct supervision," the context was entirely different, in that it was a matter of constitutional construction of the powers of the Attorney General of California. However, in that context, the court declared that there was no right of "control" given to the attorney general over sheriffs and district attorneys of California by reason of the constitutional provision placing them under his "direct supervision." People v. Brophy, 49 Cal.App.2d 15, 120 P.2d 946, 953 (1942).

We conclude that the contract alone is insufficient to change the ordinary law pertaining to the negligence of a subcontractor. We proceed to examine the other evidences of control to determine whether there is a showing of control over that part of the work which resulted in this injury. We find little else in this record that would tend to indicate that this is other than an ordinary subcontract, with the method of performing the work delegated. That "all" superintendents of general contractors concern themselves with "overall safety of a job" should not create liability. The primary responsibility for the safe execution of this carpentry work was clearly placed upon the subcontractor under this contract, and there is no evidence that the general contractor interfered in any way with the subcontractor's practices or in any way affirmatively contributed to this accident.

The statement by a Chesin employee that Chesin had the right "to direct the subcontractors in the order of the performance of their work," when taken in context, clearly has reference to the right of Chesin to determine the sequence of construction as between the various trades under subcontract. There is no showing here that scheduling of the work between subcontractors had anything to do with this accident.

■ Nor do we believe that a right in the general contractor to stop the subcontractor from proceeding with the work if dangerous practices are observed, which right was assumed by Chesin's supervisory employees to exist in Chesin under this contract, should carry with it liability to the employees of the very same subcontractor causing the dangerous condition.

We believe the majority of cases dealing with this problem have distinguished between right and duty in this situation. Wallach v. United States, 291 F.2d 69 (2d Cir. 1961); Gallagher v. United States Lines Co., 206 F.2d 177 (2d Cir. 1953), cert. denied 346 U.S. 897, 74 S.Ct. 221, 98 L.Ed. 398 (1953); Bedford v. Bechtel Corp., 172 Cal.App.2d 401, 342 P.2d 495 (1959);[3] Trecartin v. Mahony-Troast Construction Co., 18 N.J.Super. 380, 87 A.2d 349 (1952); and Potter v. City of Kenosha, 268 Wis. 361, 68 N.W.2d 4 (1955). An annotation entitled "General contractor's liability for injuries to employees of other contractors on the project," 20 A.L.R.2d at 868, contains the statement:

> "He [general contractor] is not liable to the employees of a subcontractor, for example, for a failure to examine appliances supplied to them by their own employer, or *for a dangerous method of operation adopted by their own employer,* the danger of which is not caused by some condition of the premises for which he is responsible." (Emphasis added)

20 A.L.R.2d at 871.

With but one exception, all of the cases cited by the plaintiff are cases falling in one of two categories which are clearly divergent from that at hand. The first of these categories involves the situation in which an owner or a general contractor has retained control of work space jointly used by various subcontractors and when injury has resulted to a workman or other invitee from a hazard in the joint space which has not been created by the employer of the workman injured. Cases falling in this category include: Parsons v. Blount Brothers Construction Co., 281 F.2d 414 (6th Cir. 1960); Scott v. John E. Branagh and Son, 234 Cal.App.2d 435, 44 Cal.Rptr. 384 (1965); Conner v. Utah Construction & Mining Co., 231 Cal.App.2d 263, 41 Cal. Rptr. 728 (1964); Gonzales v. Robert J. Hiller Construction Co., 179 Cal.App.2d 522, 3 Cal.Rptr. 832 (1960); Thill v. Modern Erecting Co., 272 Minn. 217, 136 N.W. 2d 677 (1965); and Lee v. Junkans, 18 Wis.2d 56, 117 N.W.2d 614 (1962).

The other category, closely related, pertains to the duty of the general contractor to coordinate the work of his subcontractors so that if the dangerous condition is created by the interaction of the work of two trades, the general contractor may be held responsible for the death or injury to workmen on the job. Cases cited by the plaintiff falling in this category are Bergquist v. Penterman, 46 N.J.Super. 74, 134 A.2d 20 (1957); Dudar v. Milef Realty Corp., 258 N.Y. 415, 180 N.E. 102 (1932) and Robert E. McKee, General Contractor, Inc. v. Patterson, 263 S.W.2d 326 (Tex.Civ. App.1954).

The one decision cited by plaintiff which appears to be pertinent to the problem here presented, that is, a situation where a hazard has been created by a subcontractor which has resulted in injury to an employee of that same subcontractor, is Quinones v. Township of Upper Moreland, 293 F.2d 237 (3d Cir. 1961). It is possible that this decision is based upon the statutory law of

---

**3.** Woolen v. Aerojet General Corp., 57 Cal. 2d 407, 20 Cal.Rptr. 12, 369 P.2d 708 (1962), disapproves of the "[m]oreover" reason given by *Bedford,* 342 P.2d 503 to the effect that there is no duty to "others" under §§ 414 and 416 of the Restatement (Second) of Torts, to employees of independent contractors. This result was also reached as to § 416 (but not as to § 414) in Welker v. Kennecott Copper Company, 1 Ariz.App. 395, 403 P.2d 330 (1965). In disapproving of this statement, *Woolen* leaves the *Bedford* holding untouched, the California Supreme Court stating that the disapproved statement was "unnecessary to the decision," 20 Cal.Rptr. at 15, 369 P.2d at 711.

Pennsylvania (see 293 F.2d at 241). If the decision is based upon the common law, it cites no authority in support of its holding.

■ The fact that Chesin's superintendent knew of this "unsafe" condition does not create liability as to the employees of the subcontractor creating the unsafe condition. We adopt the language of *Bedford* in this regard:

"The evidence shows that representatives and inspectors of both P. G. & E. and Bechtel observed the work practically daily. There was testimony that the necessary stability of the tank during erection could have been achieved easily by supporting each plate ahead of the bull with a guy wire and using strongbacks on the horizontal seam as well as on the vertical seam. From the experience of some, at least, of the Bechtel and P. G. & E. representatives, it could be inferred that both companies should have known that the manner of erection of the tanks was not safe. However, that fact does not make the defendants liable. No duty towards the independent contractor's employees arises thereby." 342 P.2d at 502.

We distinguish Fluor Corporation v. Sykes, 3 Ariz.App. 211, 413 P.2d 270 (1966), in that there was substantial evidence that a "part of the work," that is, responsibility for safety and accident prevention, had been taken over as the "prime responsibility" of the general contractor. (See 3 Ariz.App. at 214, 413 P.2d at 273.) Welker v. Kennecott Copper Company, 1 Ariz.App. 395, 403 P.2d 330 (1965), is clearly distinguishable in the degree of the control exercised.[4] We do not consider plaintiff's citations of Erhart v. Hummonds, 232 Ark. 133, 334 S.W.2d 869 (1960), Miller v. De-Witt, 37 Ill.2d 273, 226 N.E.2d 630 (1967), and Nauman v. Harold K. Beecher & Associates, 19 Utah 2d 101, 426 P.2d 621 (1967), to be apposite. These are all de-

cisions dealing with the liability of an architect, and we believe there are special considerations pertaining to the employer-independent contractor status which are not pertinent to an action against an architect.

The decision to deny liability in this action is prompted not only by the weight of decided cases in this area of law, but also by a consideration of what would be the practical effect if retention of control to the extent evidenced in this case were to give rise to tort liability on the part of the employer. Such a rule would mean that larger contractors, who have no economic need to subcontract out phases of their work, would ordinarily be subject only to Workmen's Compensation premiums without substantial threat of tort liability for failure to properly supervise the work. The workmen in the employ of such a large employer would be at a disadvantage insofar as employees working for smaller entrepreneurs are concerned. We see no additional hazard to workmen inherent in the subcontracting of work, in the manner done here, to justify any such radical distinction in liability.

■ There seems little question that if a general contractor is found to be negligent in failing to properly supervise a subcontractor's work, under well-recognized common-law principles of indemnity, the final burden of liability will be cast upon the subcontractor. See Sherk, Common Law Indemnity Among Joint Tortfeasors, 7 Ariz.L.Rev. 59 (1965). Cases relied upon by the plaintiff so hold. See Doyle v. Nels Johnson Construction Company, 382 F.2d 735 (7th Cir. 1967); Quinones v. Township of Upper Moreland, 293 F.2d 237 (3d Cir. 1961); and Sleck v. Butler Brothers, 53 Ill.App.2d 7, 202 N.E.2d 64 (1964). Busy Bee Buffet, Inc. v. Ferrell, 82 Ariz. 192, 310 P.2d 817 (1957), adopts the "active" versus "passive" negligence dichotomy upon which these indemnity cases are based. In effect then, the plain-

---

**4.** The defendant in *Welker* made no attempt to show that Kennecott was the "employer" of the deceased under A.R.S. § 23–902.

tiff here urges us to adopt the strange law that a subcontractor is to be impressed with tort liability that he would otherwise not have, simply because a general contractor agreed to provide "overall" superintendence to maintain safe working conditions, but negligently failed to do so.

The avowed purpose of the Workmen's Compensation law was to reduce litigation arising out of the employment relationship. See Pressley v. Industrial Commission, 73 Ariz. 22, 236 P.2d 1011 (1951); and Article 18, § 8, Ariz. Const., A.R.S. The control exercised here is no more than is reasonably necessary for a general contractor to exercise in order to properly carry out the responsibilities that the law casts upon him to coordinate the work of various subcontractors and to provide a reasonably safe place to work. If liability is to be imposed because of the retention of such controls, then the purposes of the Workmen's Compensation law will be frustrated, and the legal-industrial tool of the independent subcontract will be singled out for unmerited special liability. Neither seems to be a salutary result.

For the reasons stated, the judgment rendered is reversed and the cause remanded to the lower court with instructions to enter judgment for the defendant Chesin.

HATHAWAY, C. J., and KRUCKER, J., concur.