474 P.2d 852

Ronald REBER and State of Arizona ex rel. Industrial Commission of Arizona, Appellants,

v.

CHANDLER HIGH SCHOOL DISTRICT #202 and Glenn A. McCollum, Appellees.

No. 1 CA–CIV 875.

Court of Appeals of Arizona, Division 1, Department B.

Sept. 30, 1970.

As Modified on Denial of Rehearing

Oct. 23, 1970.
Review Denied Dec. 15, 1970.

**134**

Burch, Cracchiolo, Levie & Guyer, by Daniel F. Cracchiolo, Phoenix, for appellants.

Jennings, Strouss & Salmon, by Nicholas Udall, Phoenix, for Chandler High School District #202.

Snell & Wilmer, by Bernald C. Porter, Phoenix, for McCollum.

HAIRE, Judge.

The questions raised on this appeal require that this Court consider the possible liability of an owner and its representative, the architect, for injuries received by three employees [1] of the general contractor as a result of an unsafe method of construction utilized by the general contractor. Because of the exclusive remedy provisions of the Workmen's Compensation Act, the employer-general contractor was not initially made a party defendant. However, the general contractor became a party when the owner filed a third party complaint against the general contractor and its surety seeking indemnity for any judgment which might be entered against the owner resulting from the general contractor's negligence. After the presentation of plaintiffs' case, the trial court entered a directed verdict for the defendants and plaintiffs have appealed.

The following facts are not in dispute. In December 1962, the Board of Supervisors of Maricopa County, Arizona, acting for and on behalf of the defendant school district, entered into a written agreement for architectural services with defendant McCollum, a registered architect. Basically, the agreement provided for the preparation of plans and specifications necessary for the construction of a physical education building, including a gymnasium, and general supervision of the work in relation thereto. The construction project was presented for bids, and Verdex Steel and Construction Company became the general contractor.

Verdex fabricated and erected the structural steel used in the project's construction. The shop drawings relative to the steel, that is, size, dimension, etc., were prepared by Verdex and approved by the architect. The plans and specifications prepared by the architect did not specify a method or sequence of steel erection, but made reference to the "Specifications for Design, Fabrication and Erection of Structural Steel for Building", published by the American Institute of Steel Construction, which left the method and sequence of erection to the sole discretion of the contractor.

The roof of the gymnasium was designed by the architect to be supported by six "three-hinged" steel arches. On Tuesday, two days preceding the Thursday, October 17, 1963 collapse of the structure, the general contractor's workmen, including plaintiff Reber, a structural iron worker employed by the contractor, unloaded at the job site the unassembled portions of at least three of these arches and bolted them together. Two cranes were then used to lift the assembled parts of the arches so that they could be fastened to the vertical support columns already in place. Three such arches were erected on Tuesday without incident. On Thursday plaintiff was connecting additional steel purlins (cross-bracing) to the arches when the structure collapsed, seriously injuring him.

In addition to urging negligent supervision as a basis for imposing liability on

---

1. "Employee" or "plaintiff" in the singular as used herein refers to injured employee Ronald Reber. The Reber action was consolidated for trial with two other pending actions arising out of the same accident, and brought by the Industrial Commission of Arizona, subrogated to the rights of two other injured employees,

the owner and the architect, plaintiff contends that both should be held strictly liable in tort for alleged defects in the plans and specifications drawn and submitted by the architect. However, we need not decide whether the strict tort liability doctrine as applied in products liability cases is applicable to the "manufacturer" or designer of buildings, because in this case, there was no evidence which would support a finding ʻthat the plans and specifications were in fact defective. Plaintiff's briefs do not point out any such evidence, nor has the Court discovered any in our reading of the record.

Plaintiff's primary contention is that the evidence was sufficient to support a finding of liability based upon the negligent exercise of supervision over the work of the independent general contractor, said supervision allegedly being retained by the owner and by contract vested in its representative, the architect.

■ The question of the liability for injuries to employees of an independent contractor where the owner or other employer of such independent contractor has retained certain supervisory powers over the work of that independent ·contractor and has vested these retained powers in the representative of such owner or other employer, has been presented many times to the Arizona appellate courts. E. L. Jones Construction Co. v. Noland, 105 Ariz. 446, 466 P.2d 740 (1970); German v. Mountain States Telephone & Telegraph Company, 11 Ariz.App. 91, 462 P.2d 108 (1970); Chesin Construction Co. v. Epstein, 8 Ariz. App. 312, 446 P.2d 11 (1968); Fluor Corporation v. Sykes, 3 Ariz.App. 211, 413 P.2d 270 (1966), and Welker v. Kennecott Copper Company, 1 Ariz.App. 395, 403 P.2d 330 (1965). These cases all stand for the principle that liability for negligent exercise of retained supervisory powers can attach only when there is a showing that a *duty* has been created by the reservation of " * * * the right to exercise day-by-

day control over the manner in which the details of the work are performed. * * ʺ Jones, *supra*, 105 Ariz. at 456, 466 P.2d at 750. As stated in German v. Mountain States Telephone & Telegraph Company, *supra*, the retained supervisory controls must give the defendant control over the *method or manner of doing the details of the work* over and above the supervision and inspection rights generally reserved to make certain that the *results obtained* conform to the specifications and requirements of the construction contract. Although none of the above-cited Arizona decisions involved the vesting of these retained supervisory powers in an architect, we believe that, insofar as concerns the question of whether or not the contract documents have created a duty to the injured employee of an independent contractor, the principles developed are analogous and applicable to a fact situation involving an architect. If it is found that a duty has been created so that the architect has the duty to supervise the method and manner of actually doing the work, then the fact that the person in whom such supervision is vested is an architect might be material in ascertaining whether that supervision has been negligently exercised. In other words, assuming the existence of a duty, a different and more exacting standard of conduct might be imposed ·upon an architect than would be imposed upon an unskilled owner retaining such supervisory rights.

We are not unmindful of cases from other jurisdictions relied upon by plaintiffs which appear to impose liability upon the architect or other owner's representative without finding the existence of such a duty. One case which has gone far in this direction is Miller v. DeWitt, 37 Ill.2d 273, 226 N.E.2d 630 (1967). In our opinion these cases have disregarded fundamental contractual principles in attempting to parlay general inspection or supervision clauses which give the owner or architect

Clark Lloyd Powless and Nolen Clifford Myers. Plaintiff Reber's counsel on appeal did not represent Reber in the trial

court or otherwise participate in the trial of this action.

a *right* to stop observed unsafe construction processes into a *duty* which is neither consistent with generally accepted usage nor contemplated by the contract or the parties. The dissenting opinion in Miller, *supra*, constitutes a concise, well reasoned statement of the controlling legal principles, and is consonant with the Arizona decisions cited above.

[2, 3] · With the above-stated principles in mind, we turn to the contract documents involved in this appeal, that is, the contract between the defendant architect and the owner, and the contract documents between the owner and the general contractor. First, the defendant architect, citing Blecick v. School District No. 18 of Cochise County, 2 Ariz.App. 115, 406 P.2d 750 (1965), contends that the extent of his duties must be determined solely from the provisions of his contract with the owner, and that since he was not a party to the contract between the owner and the general contractor, the provisions of that contract relating to the architect's supervision duties have no relevance. As a general proposition, we would be inclined to agree that the contractual obligations of a party must be measured by the provisions of that party's contract, and that such obligations could not be enlarged by a separate independent contract without that party's consent. However, we do not believe that this principle is necessarily applicable under the facts of this case. Here, the evidence shows that not only did the architect prepare the contract between himself and the owner, but, in addition, he subsequently prepared the contract between the owner and the general contractor. Under these circumstances, it is our opinion that if the provisions in the contract between the architect and the owner relating to the architect's supervision obligations are ambiguous, then the provisions in the contract between the owner and the general contractor might become relevant to resolve such ambiguity.

■ Examining first the provisions of the contract between the owner and the architect, we find limited reference to the supervisory obligations vested in the architect. Provision is made for payment to the architect of 2% of the cost of the work "for supervision of the work". Under paragraph 1, entitled "The Architect's Services", it is provided that, among other duties, the architect's professional services include "Supervision of the Work". Paragraph 5 is entitled "Supervision of the Work" and provides for "general supervision to guard the Owner against defects and deficiencies in the work of contractors, but he [the architect] does not guarantee the performance of their contracts." This "general supervision" is distinguished from "continuous on-site inspection by a clerk-of-the-works". In our opinion, provisions such as these are insufficient to support, and in fact negate, a finding that the parties intended that the architect have the obligation or duty to control the contractor and his employees in the method and manner of doing the details of the work. Such provisions are more consonant with an intention that the architect have such supervisory controls as are necessary to assure that the results of the contractor's work comply in technical detail with the plans and specifications prepared by the architect. From the evidence it is clear that the parties to this contract so construed its provisions. Ordinarily this fact alone would be dispositive as to what the parties intended. However, inasmuch as the liability of these parties depends upon the extent of supervisory rights retained by the owner and placed in his representative, the architect, we would be inclined in this case not to give too much weight to their oral expressions of what was intended if these expressions were in any way in conflict with the provisions of the contract. Here we find no such conflict with the terms of the architect's contract.

■ Even if we were to consider that the provisions of the contract between the owner and the general contractor could somehow serve to enlarge the architect's supervisory duties, and further, assuming that plaintiff was injured because of an

unsafe steel erection procedure adopted by the general contractor,[2] reference to that contract would not aid plaintiff. A full reading of the documents constituting the contract between the owner and the general contractor shows clearly that the method and manner of steel erection, that is, the erection procedure, is left entirely to the discretion of the general contractor without any retained right to supervise or control such procedure. § 9.03, subsection A of the contract's specifications reads:

"Materials. The structural steel shall strictly conform to the applicable requirements of the specifications for design, fabrication and erection of structural steel for building, published by the American Institute of Steel Construction."

The applicable provisions of said publication, made a part of the contract by said reference and admitted in evidence, provide as follows:

"Sec. 7. Erection (a) Method of Erection. If the owner wishes to control the method and sequence of erection, he so specifies in the invitation to bid or the specifications that accompany it. Otherwise the fabricator will proceed according to the most economical method and sequence available to him consistent with the plans and specifications and such information as may be furnished to him prior to the execution of the contract."

From these provisions it is clear that the owner did not by contract reserve any right in itself or impose any duty upon itself or the architect to control the steel erection procedure which resulted in plaintiff's injuries.

■ Further, contrary to plaintiff's contentions, it is our opinion that A.R.S. § 32–142, subsec. A does not increase the duties assumed by the architect in his contract with the owner.

A.R.S. § 32–142, subsec. A states:

"Drawings, plans, specifications and estimates for public works of the state or a political subdivision thereof involving architecture, engineering, shall be prepared by or under the personal direction of, and the construction of such works shall be executed under the direct supervision of, a registered architect, engineer."

Plaintiff urges that this statute imposes upon the architect the duty of directly supervising the procedures and techniques employed by the general contractor in the construction of public works, and that said duty is imposed for the purpose of promoting the safety of the general contractor's employees at the construction site. If such a supervisory duty is created for the protection of persons in plaintiff's class, then it would follow that negligent exercise of that duty would give rise to an action on the part of a workman injured as a result of the breach of that duty.

Plaintiff, citing State v. Beadle, 84 Ariz. 217, 326 P.2d 344 (1958), asks the Court to infer such a detailed supervisory duty from the language "under the direct supervision of a registered architect." The court in Beadle held that a designer of a building, insofar as his design bore relation to the safety of the structure, was practicing architecture, and therefore had to be registered. In Beadle, the court dealt solely with the statute's relation to the public safety through the *design* of a structure, and did not consider the applicability of the statute in promoting the safety of a general contractor's employees through the creation of a duty on the part of the architect to supervise the method and manner involved in construction. We can see nothing in the statute, or in Beadle, requiring the finding of such a supervisory duty.

The "Illinois Scaffold Act", 48 Ill.Stats. Anno. § 60 (1969), also cited by plaintiff, and the cases construing said act, are not in point on the statutory duty question since the act specifically seeks to protect "the

---

2. In the first paragraph of plaintiff's reply brief, it is tacitly admitted that the general contractor had adopted an unsafe procedure for the initial steel erection.

life and limb of any person or persons employed or engaged" in scaffolding. The "Illinois Scaffold Act" indeed is a good example of a legislature's ability to express its intent to protect workmen, from which a duty of supervision with respect to discharging such intent may be inferred.

■ While there has been no case defining "supervision" as used in A.R.S. § 32–142, subsec. A, some light on the meaning intended may be found in the definition of "architect" used in connection with the adoption of the Technical Registration Act of 1935, Chapter 32 (1935), Laws of Arizona, the forerunner to A.R.S. § 32–142, subsec. A. "Architect" was therein defined as:

> " 'Architect' shall mean a person other than an engineer who prepares drawings or specifications or supervises *but does not superintend* the construction of buildings and structures, as an authorized agent of the owner thereof." (Emphasis added).

The Technical Registration Act, of course, as a forerunner to A.R.S. § 32–142, subsec. A does not control here but is helpful in determining the originally intended scope of the supervision function. This original legislation, coupled with the present provisions of § 32–101, subsec. 2 which defines "architectural practice" as including the "supervision of construction for the purpose of assuring compliance with specifications and design", make it clear that the supervision provisions of A.R.S. § 32–142, subsec. A were intended solely to assure that the results obtained comply with the construction specifications and design. The type of supervision contemplated therein is not a detailed superintendence of construction. These statutory provisions are much too general to support the duty plaintiff would have us find.

We hold that neither the contract documents nor the statute imposes any duty upon the architect or the owner to supervise the procedures to be utilized by the general contractor in the temporary erection of the steel structures which collapsed causing plaintiff's injuries.

■ Nor is there any evidence which would justify a holding that such supervisory control was voluntarily assumed and exercised. Plaintiff points to various conversations between the contractor's employees and the architect concerning the use of shoring plates and welding to show the voluntary assumption of control of the erection process. On the first day that the steel arches were being put in place, job superintendent Myers (also an employee of the contractor) testified that in a conversation with the architect, he mentioned that he intended to put a steel shoring plate over the end of each arch "to carry the weight", and, that the architect told him that the plate would be in the way of the finished planking. The architect denied any such conversation. However, in any event, in answer to a direct question by plaintiff's counsel, Myers testified that the reason he did not use shoring plates was that he received orders from his employers not to use the same. There is no evidence that this decision by the contractor was in any way related to the architect's alleged conversation with Myers.

On the following day, Wednesday, job superintendent Myers advised the architect that some of the purlins were "run up-hill" and that some of the arches which had been put in place were sagging. There is conflict in the testimony as to the architect's comments to the superintendent in connection with this condition. On direct examination Myers testified that the architect "informed [him] to put the steel up * * * to go ahead and put it all up, to put the purlins in and weld it." Taken by itself, this portion of Myers' testimony is subject to the interpretation that the architect told Myers not to do any welding until the purlins had all been put in. However, on cross-examination Myers made it clear that the architect did not tell him not to weld

before proceeding.[3] All of the testimony was to the effect that the sagging of the arches during the initial erection process was not unusual or out of the ordinary.

Plaintiff advances several other grounds to hold the school district independently liable. It is first urged that the asserted statutory requirement that the construction of the gymnasium be executed under the direct supervision of an architect imposed a nondelegable duty upon the school district. We have held however that the applicable statute imposed no such broad duty upon the architect, and we deem such holding and the reasoning contained therein dispositive of this ground.

It is next urged that the erection of the structural steel, due to the especially hazardous and dangerous nature of such work, imposed a non-delegable duty upon the school district to exercise due care in connection therewith. These theories of liability relating to "non-delegable duty and inherently dangerous activity" have been previously considered and rejected by several Arizona decisions involving the liability of an employer of an independent contractor to an employee of the independent contractor and thus need not be further discussed in this opinion. *See* E. L. Jones Construction Co. v. Noland, *supra*; German v. Mountain States Telephone & Telegraph Company, *supra*; Chesin Construction Co. v. Epstein, *supra*; Fluor Corporation v. Sykes, *supra*, and Welker v. Kennecott Copper Company, *supra*.

Having decided that plaintiff has failed to establish the creation of a duty owed by the defendant-owner and architect to plaintiff, we do not consider it necessary to discuss other substantial contentions raised by defendants in support of the directed verdict to the effect that, even if we assume

evidence sufficient to create such a duty, still there is no expert or lay testimony concerning the standard of practice for architects in the area and therefore there can be no finding that defendants breached that duty, and further that there was a complete absence of evidence showing proximate cause.

The judgment of the trial court is affirmed.

EUBANK, P. J., and JACOBSON, J., concur.

---

3. "Q. Is it a fair statement that in your conference with Mr. McCollum on Wednesday, whatever hour it occurred, that he told you that you were not to weld until the steel was up to the prescribed elevation?

"A. Mr. McCollum did not tell me, not on Wednesday.

"Q. He did not tell you to weld?

"A. He did not tell me not to weld.

"Q. That decision was your own?

"A. No, sir.

"Q. Whose decision was it?

"A. Well, the steel foreman's.

"Q. The steel foreman's decision?

"A. Under standard procedure."