341 So.2d 646 (1977)
DICKERSON CONSTRUCTION COMPANY, INC., et al.
v.
PROCESS ENGINEERING COMPANY, INC.
No. 49023.
Supreme Court of Mississippi.
January 12, 1977.
Watkins & Eager, P.N. Harkins, III, Velia Ann Mayer, Young, Scanlon & Sessums, James Leon Young, Jackson, for appellant.
John R. Poole, Percy Stanfield, Jr., Brown & Stanfield, Jackson, for appellee.
Before GILLESPIE, SUGG and BROOM, JJ.
GILLESPIE, Chief Justice, for the Court.
This appeal involves, among other things, the extent of a firm of Architects-Engineers' duty to administer or supervise the construction of a building and the sufficiency of proof as to the alleged failure of the contractor to execute the contract.
Process Engineering Company, Inc. (hereinafter Owner), sued Dickerson Construction Company, Inc. (hereinafter Contractor), and William H. Cooke, Jr., Nelson Lee Douglass and Robert Earl Farr, d/b/a Cooke-Douglass-Farr, Ltd. (hereinafter Architects-Engineers). Owner charged Architects-Engineers with failure to properly design the building in question and failure to properly supervise construction, and charged Contractor with failure to follow the plans and specifications of the Architects-Engineers. Owner charged that these omissions were the proximate cause of the damages to the building and that the defendants were jointly liable to Owner.
*647 After a jury trial and verdict, the Circuit Court of Hinds County entered judgment for the Owner against the Architects-Engineers and Contractor for $105,000.
In the latter part of 1967, Architects-Engineers undertook to design, prepare plans and specifications for, and administer the construction of a commercial building to house Owner's metal treatment and plating operations. Pursuant to a written contract, plans and specifications were prepared by Architects-Engineers, who also prepared all contracts and handled the advertisement for bids. On October 16, 1967, Contractor and Owner entered into a contract to construct the building for the sum of $100,845. The plans and specifications were made a part of the construction contract.
Prior to the date of contract between Owner and Architects-Engineers, and upon the advice of the latter, Owner employed Ware-Lind Engineers, Inc. (hereinafter Soil Engineers), to test the soil and make recommendations with reference to the type of foundation and drainage on the lot where the building was to be constructed. The Soil Engineers made a written report to Architects-Engineers, stating that beginning about five to seven feet below the surface was a layer of expansive soil known as Yazoo clay. It was recommended that surface grading be kept to a certain minimum so as not to remove the non-expansive top soil more than necessary, and to provide piers to at least twenty feet below the existing grade. The Soil Engineers also recommended, that in order to insulate the exterior grade beams from swelling pressures of the expansive clay, voids be formed under the grade beams (the reinforced concrete beams resting on the piling or piers which in turn support the walls and roof) and that the void be formed by using cardboard boxes filled with vermiculite. The proof showed that the cardboard boxes filled with vermiculite would hold the weight of the concrete when poured to form the grade beams and the cardboard boxes would disintegrate, leaving a void filled with vermiculite. The vermiculite would prevent soil from sloughing in from the side into the void and at the same time would yield to pressure from below created by the expansive Yazoo clay. The Soil Engineers also recommended that the soil under the floor slab be of a select clay or non-expansive sandy clay compacted uniformly. It was further recommended that "drainage around the building, particularly in the rear, east side, should provide rapid surface run-off of storm water away from the foundation."
The building was completed and occupied in the spring of 1968, and Owner paid all of the charges made by the Architects-Engineers and the Contractor. About six months after Owner moved into the building, the wall around the front canopy began to crack and a representative of the Architects-Engineers inspected the building at Owner's request and installed a metal brace under the canopy. The front wall continued to crack. The roof began to leak within less than a year, and the building continued to deteriorate. The concrete blocks in various parts of the building were crushed, the wall cracked and buckled, cracks developed in the concrete floor slab, the building leaked, requiring numerous repairs, and the panelling in the office walls buckled. There is no dispute that the building by the spring of 1974 had sustained extensive damages. In February, 1974, holes were dug in and around the building both by the Owner and by the Architects-Engineers to try to determine what caused the building to deteriorate. The water table under and around the building was within two or three feet of the surface, depending upon where the hole was dug. Prior to construction the water table was about ten feet lower.
Although it was undisputed that the building sustained severe damage by the expansive forces of Yazoo clay, it was hotly disputed as to why the Yazoo clay became saturated with water and whether or not the grade beams suffered structural damage.
The basic structural components of the building should be distinguished from the floor slab. The weight of the walls and roof was supported by pilings and grade *648 beams. Grade beams are reinforced concrete poured across the pilings. The slab was free-flowing in the sense that it did not support the outside walls and roof. The plans called for cardboard boxes (Jay voids) to be placed under the grade beams to act as a safety valve. When the Yazoo clay begins to expand, the voids would absorb the expansion.
The Owner's testimony indicates that the voids had not been formed under the grade beams as specified by the plans. The Owner's testimony also indicates that backfill in and around the grade beams consisted of Yazoo clay and not a select backfill. The theory of the Owner is that the damage to the building resulted mainly from the failure of the Contractor to construct drainage ditches or swells on the east side of the building as called for by the plans and as recommended by the Soil Engineers. This failure caused the ponding of water and the saturation of the Yazoo clay. The resulting expansion caused a lateral movement (due to improper backfill) as well as an upward movement (due to the lack of voids) in the grade beams. The Owner's testimony indicated that the grade beams suffered structural stress and cracks. Also due to improper drainage, the floor slab heaved upward causing damage.
The Architects-Engineers urge that there was no movement of the grade beams and that the grade beams did not show any signs of stress. They urge that the damage to the building was caused entirely by the heaving of the floor slab. It is their contention that the Owner negligently allowed chemicals used by Owner to deteriorate the floor slab and erode the epoxy lined waste discharge pipe located under the slab. As a result of this deterioration in the slab and in the pipes, water used by Owner was allowed to saturate the ground under the floor slab. Following this saturation, the Yazoo clay expanded, forcing the floor slab upward and thus causing all the damage to the building. They deny that the damage to the building was caused by the expansion of the Yazoo clay under the grade beams. It is also contended that the drainage system as called for by the plans was in fact installed and that the topographical contour of that drainage system was materially altered after completion of the building.
It is Architects-Engineers' contention that it owed no duty to supervise the construction of the building but only the duty of general administration and not to guarantee the performance of the contracts. The Architects-Engineers and Contractor also contend that the Contractor followed the plans and specifications.
The principal witness for Owner was Ted L. Biddy, a consulting engineer who was employed by Owner in February, 1974, to determine the cause of the damage to the building and to estimate the cost of remedial and permanent repairs. At that time, according to Mr. Goodman, President of Owner, the building had deteriorated to the point that it was not safe or suitable for further use. Biddy had holes dug on the east side of the building, which is the high side, and also had the concrete broken and holes dug on the inside of the building to determine what kind of fill soil had been used and the level of the water table. He found that the building had been heavily damaged due to the cracking and the crushing of the concrete blocks, that the interior and exterior walls had large cracks in them, large cracks were found in the concrete floor, and the grade beams along the northeast corner of the building were cracked. Biddy saw no indications that water, extensive amounts of which were used in Owner's business, got into the underground foundation from the inside. The interior of the building was covered with a floor slab which had a crown in the middle sloping to troughs along the sides. Biddy prepared a topographic map of the conditions on the outside of the building. It showed the ponding of water next to the building on the east side. He testified that he examined the plans and specifications that called for a swell or ditch approximately twenty feet from the east side of the building which was for the purpose of draining the water away from the building and into the ditch. He did not find this ditch when he *649 made his survey. He testified there was no drainage system on the east side of the building and that the water that collected there, including that which ran off the building, would pond until it soaked in or evaporated. Biddy also testified that he made examinations of the soil under the grade beams and there was no evidence that Jay voids had been installed. The plans did provide for Jay voids but it is conceded that the plans did not provide that the voids be filled with vermiculite and none was placed therein. Biddy also found Yazoo clay under and around the grade beams. He found that there were limbs and debris in the soil under the slab and it was not select fill as provided by the plans and specifications. Biddy recommended remedial repairs to prevent the building from further deterioration at a cost of $22,432. He stated that an outside drainage system would have to be constructed to lower the water table before permanent repairs could be made. He estimated permanent repairs would cost $85,354. Biddy was of the opinion that the failure of the Contractor to use select backfill material contributed to a one and one-half inch lateral movement of the building, which contributed to the cracking and crushing of the concrete blocks. Biddy's testimony was corroborated to a considerable extent by photographs.
Robert Lunardini, a consulting engineer, made an examination of the building and was asked a lengthy hypothetical question. It was his opinion that the primary cause of the problem with the building was improper drainage. He also testified that the sole cause of the damage to the building was not the heaving of the floor slab but that the grade beams had also been heaved upwards.
L.B. Mims, who installed a drainage system on the east side of the building after Mr. Biddy made his recommendations, stated that he had observed the building from time to time since its construction and that no ditching had been provided on the east side to amount to anything, and that water had ponded on the east side of the building.
R.W. Goodman, President of Owner, testified that there had been no change in the topography on the east side of the building from April, 1968, until the remedial repairs were made shortly before trial, and since 1968, water had stood on the east side of the building.
Nelson Douglass, one of the defendants, testified. He is an engineer with the firm of Cooke-Douglass-Farr. He testified that in April, 1974, he got down in the holes around the inside and outside of the building and that the grade beams were smooth, which indicated that Jay voids had been used. Douglass was of the opinion that damage to the building was caused by water flowing from inside the building getting beneath the slab causing the Yazoo clay to expand, forcing the slab upwards, and that the situation had gotten worse due to the fact that water was being allowed to drain into the (recently dug) inspection holes. He testified that one of Architects-Engineers' engineers generally went by the job each morning during construction.
Defendants also had tests performed to determine the chemical content of samples of water taken from various locations inside and outside the building. These tests indicated that some process water had gotten under the building from the inside.
Garland Wright, a general civil engineer, investigated the building in 1974, for the purpose of giving an opinion of what he thought was causing the damage to the building. At that time, he saw liquid draining into the cracks in the floor slab. He found no evidence that the grade beams had moved and saw no cracks suggesting structural stress. He was also of the opinion that Jay voids had been placed under the grade beams.
Robert W. Karlak, an engineer with Architects-Engineers, testified that he spent two days on the job site when they were drilling the pilings and when the concrete was poured and he made other inspections from time to time. He said in April, 1974, there were no structural failures of the grade beams and that the smoothness under the grade beams indicated that Jay voids had been properly placed before concrete was poured. He found no lateral movement. *650 He said that Dickerson followed the plans and specifications and he saw no deviation therefrom. He was of the opinion that the damage to the building was caused by the upward heaving of the floor slab. He thought that water coming from inside caused the saturation of the underground soil.
William H. Cooke, Jr., one of the principals of Architects-Engineers, was also of the opinion that the damage to the building was due to the corrosive effect of chemicals in the process water that had corroded the discharge waste water pipe under the slab and the slab itself, thus permitting water coming from inside the building to saturate the underlying soils.
Ralph Dickerson, President of Contractor, testified that the construction of the building and the drainage system were built strictly in accord with the plans and specifications. He said he set the grade in the outside drainage system. He estimated the building could be repaired for $21,617.50.
Owner offered testimony of a plumber who after running pressure tests testified that there was no leakage of process water from the fiber glass lined discharge pipe.
The jury was amply justified in finding that the lack of drainage of surface water east of the building was the cause of the Yazoo clay becoming saturated with water.
Was the verdict supported by substantial evidence?
The evidence on behalf of Owner, although disputed, made a factual issue for the jury which was resolved by the jury in favor of the Owner. We have set out this evidence in considerable detail hereinabove and we are of the opinion that the evidence amply supports the verdict. The parties all seem to agree that the pressures created by expansion of the Yazoo clay by absorbing water was the principal cause of the damage. The primary factual issue is how the water got into the Yazoo clay, whether it came from inside the building or from outside, and whether Owner changed the topography after construction. We think the weight of the evidence is that the water saturated the Yazoo clay as a result of the lack of drainage of surface water from the east side of the building. According to the evidence, water ponded in that area from the time the building was constructed until the remedial repairs were made in 1974. It is argued that a sidewalk built near the northeast corner of the building and an addition built on the south of the building caused the ponding of the water, but there is positive proof that this sidewalk and building did not interfere with the drainage and that there had been no change in the topography of that area since the building was constructed. We conclude that all of the several disputes in the testimony were for the jury to determine.
The resolution of the question posed in point 1 disposes of the second point raised by Architects-Engineers wherein it is contended that Architects-Engineers were entitled to a peremptory instruction.
Did the trial court err in granting Instruction No. 5 for the plaintiff?
Architects-Engineers contend that it was error for the court to include in this instruction a statement that it was the duty of Architects-Engineers to exercise reasonable care and skill in supervision of construction to the extent necessary to attain the purposes intended. The contract between the Owner and the Architects-Engineers provided as follows:
The Architect will endeavor by general administration of the construction contracts to guard the Owner against defects and deficiencies in the work of contractors, but he does not guarantee the performance of their contracts. The general administration of the Architect is to be distinguished from the continuous on-site inspection of a Project Inspector.
The duties and responsibilities of the Architects-Engineers are more fully explained in the contract between the Contractor and Owner. This contractual document was prepared by the Architects-Engineers, as well as the agreement between Architects-Engineers and Owner. Where it is necessary, as in this case, to determine what is *651 meant by the term "general administration" in the agreement between Architects-Engineers and Owner, the agreement between the Owner and Contractor becomes particularly relevant. Reber v. Chandler High School District, 13 Ariz. App. 133, 474 P.2d 852, 855 (1970).
The agreement between the Contractor and the Owner provides that the Architects would be the Owner's representative during construction, and would have authority to act for the Owner to the extent provided in the contractual documents. The Architects-Engineers at all times had access to the job and had authority to reject work which did not conform to the contractual documents.
Other provisions of that contract provide:
2.24 The Architect will make periodic visits to the site to familiarize himself generally with the progress and quality of the Work and to determine in general if the Work is proceeding in accordance with the Contract Documents. On the basis of his on-site observations as an architect, he will keep the Owner informed of the progress of the Work, and will endeavor to guard the Owner against defects and deficiencies in the Work of the Contractor. The Architect will not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. The Architect will not be responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, and he will not be responsible for the Contractor's failure to carry out the Work in accordance with the Contract Documents.
.....
9.4.2. The issuance of a Certificate for Payment will constitute a representation by the Architect to the Owner, based on his observations at the site as provided in Subparagraph 2.2.4 and the data comprising the Application for Payment, that the Work has progressed to the point indicated; that, to the best of his knowledge, information and belief, the quality of the Work is in accordance with the Contract Documents (subject to an evaluation of the Work as a functioning whole upon Substantial Completion, to the results of any subsequent tests required by the Contract Documents, to minor deviations from the Contract Documents correctable prior to completion, and to any specific qualifications stated in his Certificate); and that the Contractor is entitled to payment in the amount certified. In addition, the Architect's final Certificate for Payment will constitute a further representation that the conditions precedent to the Contractor's being entitled to final payment as set forth in Subparagraph 9.7.2 have been fulfilled. However, by issuing a Certificate for Payment, the Architect shall not thereby be deemed to represent that he has made exhaustive or continuous on-site inspections to check the quality or quantity of the Work or that he has reviewed the construction means, methods, techniques, sequences or procedures, or that he has made any examination to ascertain how or for what purpose the Contractor has used the moneys previously paid on account of the Contract Sum.
.....
9.7.2. Upon receipt of written notice that the Work is ready for final inspection and acceptance and upon receipt of a final Application for Payment, the Architect will promptly make such inspection and, when he finds the Work acceptable under the Contract Documents and the Contract fully performed, he will promptly issue a final Certificate for Payment stating that to the best of his knowledge, information and belief, and on the basis of his observations and inspections, the Work has been completed in accordance with the terms and conditions of the Contract Documents and that the entire balance found to be due the Contractor, and noted in said final Certificate, is due and payable.
The building specifications, a document also prepared by the Architects-Engineers, provides for specific responsibilities of the *652 Architects-Engineers. Provisions of the specifications provide in part:
Remove debris from excavations before backfilling; do not backfill against foundation walls until directed by Architect-Engineer.
.....
Splices [used in the reinforcement of concrete] shall be approved by the Architect-Engineer.
.....
All areas to receive concrete shall be inspected and approved by the Architect-Engineer prior to any pouring of concrete.
.....
After pipe lines have been tested, inspected, and approved by the Architect, and prior to backfilling, remove forms and clean excavation of trash and debris. Backfill with clean material free from debris and containing sufficient moisture for proper compaction; compact thoroughly; puddle only if directed; bring to suitable elevation above grade to provide for settlement and shrinkage.
The requirements that the Architects-Engineers be present at certain stages of construction and to certify progress payments and to make a final inspection and certification means that the Architects-Engineers will use reasonable care to see that the Contractor constructs the building in substantial compliance with the plans and specifications.
We do not find the use of the word "supervision" in the instruction to be reversible error. Architects-Engineers argued in objecting to this instruction that the Architect was under a duty only of "general inspection" rather than "supervision." We find no need to make such a narrow distinction. "Inspection" would probably have been a better word than "supervision" in the instruction in question, but Architects-Engineers may not complain because "supervision" does not connote a higher standard of duty than "inspection." The contract required Architects-Engineers to oversee the placing of backfill against the foundation walls, inspection and approval before pouring of concrete; and to make a final inspection that the work had been completed in accordance with the contract documents. The instruction did not imply that Architects-Engineers had a duty to make continuous on-site inspection or supervision, or that Architects-Engineers guaranteed the Contractor's work.
Moreover, the factual issues do not involve the question of the failure to make continuous on-site inspection or supervision but whether Architects-Engineers used reasonable care in making the observations or inspections that the proof showed they did make.
Did the court err in granting Instruction No. 8 for the plaintiff?
Instruction No. 8 is as follows:
The court instructs the jury for the plaintiff that if you find for the Plaintiff, you may take into consideration all damages, if any, which have been proved by a preponderance of the evidence in this cause, and in arriving at the amount of damages, if any, you may take into consideration the following:
1. All costs to the Plaintiff for remedial repairs, provided that you believe from a preponderance of the evidence that such remedial repairs were reasonable and necessary to protect and preserve the building from further deterioration.
2. The cost to the plaintiff of all permanent repairs which are reasonable and necessary to restore the building to its original state of completion.
3. All damages, if any, which will be caused as a result of business interruption during permanent repairs made to the building.
As to Item No. 1, it is contended that the jury should have been instructed on the before and after rule rather than the cost of repair. It should be noted that no evidence was presented on this question. Further, the building was repairable and it was shown that it would have cost between one and one-half and three times the original cost of the building to replace it.
*653 As to Item No. 2, it is contended that the instruction allowed recovery for certain items, including expensive underground drainage systems, that were never intended when the building was constructed. However, the proof indicated that such improvements were necessary before any permanent repairs could be made.
It is also argued that Instruction No. 2 was erroneous in that it did not allow for depreciation. As to this charge, we point out that appellants never presented any proof as to depreciation. Further, we are not convinced that appellants would have been entitled to a deduction for depreciation due to the fact that the building began to fail within six months after it was completed.
We find no reversible error in the quoted instruction except as to Item 3. Specific objection was made to Item 3 on the ground that it was "too vague and general in regard to the element of damages which may or may not be incurred during the period of repairs." Item 3 of this instruction is fatally defective in that it allowed the jury to determine the measure of damages. This case falls within the rule laid down in Copiah Dairies, Inc. v. Addkison, 247 Miss. 327, 153 So.2d 689 (1963), wherein this Court said: "The instruction furnishes no guide to the jury to be used in awarding damages for these items." 247 Miss. at 338, 153 So.2d at 694.
We have considered various other assignments of error by Architects-Engineers and find no reversible error. The complaint made of the failure of the court to sustain objection to the hypothetical question propounded to witness Lunardini has been carefully considered. There are imperfections in this question but we do not think that it is reversible error.
After careful study, we find that the refusal of Instructions 5 and 8 requested by Architects-Engineers was not reversible error.
Numerous other questions are raised by Contractor, most of which are already answered. It is the contention of Contractor that the record is completely devoid of any testimony to support the allegations that the Contractor failed to install grading and drainage systems according to the plans and specifications on the east or high side of the lot. We have already stated the testimony supporting Owner's charge that no drainage system was installed on the east side of the building. Photographs taken in February, 1974, showed water standing along the east side of the building. The record clearly establishes that water standing on the upper side of this building would saturate the Yazoo clay and cause it to expand and damage the building. Mr. Goodman, as already noted, testified that there had been no change in the topography since the building was constructed and the weight of the testimony indicates that this failure was a proximate cause of the damage to the building. Mr. Biddy testified that the metal addition and the sidewalk had no effect on the permanent water retention areas along the east side of the building.
The contention that there was a misjoinder of parties is raised by Contractor for the first time in this Court. We find no merit in this contention.
In sum, the evidence in this case justifies the jury's verdict that damages were proximately caused by failure of the Contractor to follow the plans and specifications. It was also justified in finding that Architects-Engineers negligently failed to require the Contractor to construct the building and drainage system in accordance with the plans and specifications.
Because of the error in the instruction on damages, the case is reversed on that issue and affirmed on the question of liability and remanded for retrial on the issue of damages only.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
PATTERSON and INZER, P. JJ., and SMITH, ROBERTSON, SUGG, WALKER, BROOM and LEE, JJ., concur.