403 P.2d 330

**Melvin J. WELKER, Administrator of the Estate of Holly M. Welker, Deceased, Appellant,**

v.

**KENNECOTT COPPER COMPANY, a corporation, Appellee.\* 2 CA–CIV 21.**

Court of Appeals of Arizona.
June 15, 1965.

---

\* This appeal was filed with the Arizona Supreme Court and assigned that court's

No. 7472. The matter was referred to this court pursuant to § 12–120.23 A.R.S.

Rees, Estes & Browning, Tucson, Paul G. Rees, Jr., Tucson, of counsel, for appellant.

Fennemore, Craig, Allen & McClennen, Phoenix, Calvin H. Udall, Phoenix, of counsel, for appellee.

MOLLOY, Judge.

This is an appeal from a judgment rendered in favor of the defendant Kennecott Copper Company and against the plaintiff, administrator of the estate of a deceased workman who was killed by a dirt slide into an excavation in which such workman was employed upon property owned by the defendant. The case was submitted by the trial court to a jury, and the jury being unable to agree, a mistrial was declared. Subsequently, the court granted a motion of the defendant for judgment on the grounds that there was insufficient evidence to go to the jury on the question of the liability of the defendant.

Both parties to this appeal agree that the outcome thereof should be determined by an evaluation of the evidence presented in the five day trial. The facts will be stated either as they were undisputed or as viewed most favorably towards the plaintiff's contentions, as required by the procedural posture of this appeal.

The defendant, Kennecott, is the owner of substantial mining properties in the vicinity of Ray, Arizona. In 1957, it determined to make substantial additions to its crushing and milling facilities so as to add approximately 50 per cent to its capacity, by a total expenditure of between fifteen and sixteen million dollars. The engineering department of Kennecott prepared specification criteria as to the type of plant desired and the location thereof. These were put out to bid, with the successful bidder required to submit detailed plans and specifications, subject to the approval of Kennecott. The contract was a cost plus a fixed fee contract, and The Stearns-Roger Manufacturing Company was the low bidder.

Amongst the construction to be performed by Stearns-Roger was a crushing plant, the main building of which was approximately 200 feet by 75 feet. Kennecott's design criteria indicated that this plant was to be located on the northwest bank of an arroyo. The general area of construction was covered by tailings from milling operations theretofore conducted by Kennecott to a depth of between three to five feet. Below this the soil was a loose sand, rock and gravel, referred to as "slope wash" in the testimony, to a depth of between ten and fifteen feet. Below this was "Gila conglomerate," a tightly packed mixture of rock, clay and gravel comparatively well solidified.

In order to give the new building with its machinery a satisfactory foundation, it was necessary to excavate down to the Gila conglomerate and to dig into this conglomerate for the footings of the building. Welker, the plaintiff's decedent, was one of Stearns-Roger's employees for this work.

The excavation for this building commenced on or about January 23, 1959. By February 2, the area had been excavated down to a "working level," which was approximately at the top of the Gila conglomerate formation. In the area where Welker met his death, the excavation as to this working level was approximately ten feet below natural grade. Along the side of the excavation the tailings and the slope wash formed an almost vertical bank. Approximately a day and a half before the accident in question three "footers" were dug into the Gila conglomerate in close proximity to this bank. Each of these "footers" was approximately 20 feet long, 6 to 8 foot wide, and 10 foot deep. Welker was "cleaning out" one of these footers at the time of his death.

The sides of the footers were almost vertical and one end of the footer in which Welker was working coincided with the bank formed by the slope wash and tailings, so that there was a total bank, almost vertical, of approximately 20 feet high next to which Welker was working. There were

five men in the particular footer at the time of a bank collapse immediately above the footer. There was a Stearns-Roger's air compressor operating on the top of the bank at the time, supplying compressed air to jackhammers operating in the footer.

The piece of embankment which fell into the footer contained approximately 486 cubic feet of material. In vertical depth, the sluff-off was 7 to 8 feet in height, the lower portion thereof being in the slope wash material. Welker was the closest to the bank and was covered with tailings, sand, rock and gravel and, before he could be extricated, suffocated.

Plaintiff's complaint, upon which issue was joined, alleged that Kennecott was negligent and therefore liable to the plaintiff, in the following respects:

(1) Permitting power tools and equipment to be operated near the top of the embankment;

(2) Failure to adopt and enforce standard safety precautions;

(3) Failure to exercise reasonable care to supply plans and specifications reasonably sufficient to maintain the land in a safe condition;

(4) Undertaking as an owner the construction through an independent contractor of work which the defendant should have recognized as necessarily creating an unreasonable risk of bodily harm to the defendant unless specific precautions were taken to protect workmen such as the decedent and negligently failing to exercise reasonable care to cause such precautions to be taken;

(5) Failing to supervise and control in a prudent manner that part of the operations over which it retained control, and

(6) Failure to warn the defendant of the danger resulting in his death.

Among the controls retained by Kennecott under the subject contract were:

(1) Kennecott's prior approval was necessary for the employment of subcontractors. [General Condition # 6]

(2) Kennecott could require the removal of any employees on the job whenever deemed necessary in the interests of Kennecott. [General Condition #6]

(3) Kennecott's prior approval was necessary for the purchase of all materials, supplies, appliances, tools and plant equipment to be provided. [General Condition # 7]

(4) Kennecott could make changes, alterations, additions or deletions to the plans and specifications at any time so long as the same were consistent with the original objective of the project. [General Condition # 8]

(5) Kennecott could have extra work performed not included in the scope of the work, paying for same at actual cost plus six and one-half per cent. [General Condition # 9]

(6) Kennecott had the right to terminate the contract at any time, in which event there would be an "equitable settlement" on the contractor's fixed fee. [General Condition # 12]

(7) In order to be included in the costs for which the contractor was to be reimbursed, the following items had to have "prior approval" of or be authorized by Kennecott [Special Condition # 2]:

(a) The purchase or rental of all equipment, materials and supplies and the manufacturer, quality and vendor thereof. [Special Condition 2a, c, d, e]

(b) Cost of necessary maintenance and repairs of construction equipment, tools, et cetera. [Special Condition 2f]

(c) The salaries or wages of certain of contractor's employees at its Denver office, including the Assistant to the Project Manager, process engineers, the Project Engineer, material engineers, and specification engineers, "each employee and his salary or wage to be subject to" Kennecott's "prior approval." [Special Condition 2h]

(d) The salaries of certain key employees and in certain categories at the construction site, "each employee and his salary or wage to be subject to" Kennecott's "prior ap-

proval." These included the General Construction Superintendent, the Assistant General Construction Superintendent, the Resident Engineer, the Area Superintendent, Craft Superintendents, the Field Engineer, the Safety Engineer, and various other key personnel. [Special Condition 2k]

(e) Salaries, fees, travel and living expenses of outside consultants, engineers and technicians. [Special Condition 2v]

(f) Cost of programming and computer service. [Special Condition 2w]

(8) Kennecott had the right to suspend progress payments to the contractor towards the fixed fee when in its opinion progress did not justify the payment rate specified in the contract. [Special Condition #5]

(9) Before any specifications and drawings for work to be done and orders for material could be released to the field for use the same must be submitted to Kennecott "for approval."

(10) All bids received by the contractor for the supplying of materials were to be submitted to Kennecott, who would select the bids upon which the contractor would be authorized to purchase. [Special Condition #8]

(11) Toilet facilities were to be built by the contractor, to be located by direction of Kennecott. [Special Condition #8]

(12) The equipment when completed was to be serviced, operated, tested and adjusted by the contractor so as to indicate satisfactory performance to Kennecott. [Special Condition #14]

The contract required Stearns-Roger to provide all detailed engineering design complete with working drawings and material specifications and to do all things necessary to construct and test the desired facilities. The contractor provided under its contract in excess of 900 detailed drawings. Stearns-Roger guaranteed all materials and workmanship for a period of one year after acceptance. Under the contract, Kennecott was required to have a representative on the project at all reasonable times to act for it in connection with the contract.

Prior to letting the contract in question, Kennecott had a "soil investigation" made by test drillings in the areas of proposed construction. A written report of these tests was submitted to Kennecott, which in turn provided the same to Stearns-Roger. Prior to commencement of construction, Stearns-Roger in turn had a soil investigation made by another firm of soil engineers. Both reports were admitted in evidence.

Expert testimony as to the import of these soil tests was introduced by both the plaintiff and the defendant. Plaintiff's expert testified that the soil overlying the Gila Conglomerate in the area of construction was essentially cohesiveless and that the material could not be expected to stand in a natural state of repose at anything in excess of approximately 45° without bank failures occurring in some places. According to this engineer, the reports together with the fact that jackhammering was planned to occur in the immediate vicinity of the embankment would indicate that this bank would fail and that sloping and/or shoring was necessary in order for safe working conditions to prevail at this particular place.

There was nothing in either soil report nor in the testimony of any expert to the effect that tailings were any more dangerous than ordinary slope wash as far as excavations are concerned. To the contrary, the testimony was that tailings would hold up in an embankment somewhat better than the sand, gravel and rock which lay below them in this area. As to this slope wash, the testimony was that it was similar to the material found generally in the southwest in valleys and arroyos, being material washed off by intermittent rains and weathering from the surrounding slopes and brought to a deposit in the lower levels through natural processes. Uncontradicted expert testimony was to the effect that any excavations, as well as all construction work, is dangerous to a certain degree. There was testimony that soil of this type

loses cohesiveness as it dries out and that the sand and gravel below the tailings would tend to dry out faster than the tailings after being exposed by a cut.

The contract had no provision requiring sloping or shoring of excavations unless the following would constitute such: "Excavations for buildings and excavations accessory thereto shall be protected and guarded against danger to life and property." The field drawings for this particular excavation did not have any provision for sloping or shoring of the walls. The decision not to slope or shore this particular bank was made by Stearns-Roger's field superintendent, who had not been provided with a copy of the soil tests made.

The plaintiff offered evidence which was rejected by the trial court on objection as to the following:

1. That there was sloping and shoring of embankments in similar material at other locations on this job prior to Welker's death.

2. That after the accident in question, Kennecott's manager required a vice president of Stearns-Roger to come to Ray for consultation and informed this official and other officials of Stearns-Roger that its safety program on this job would have to be improved, and

3. That about this time the embankments in question were sloped back by Stearns-Roger so as to be an angle of about 45°.

On appeal, the plaintiff predicates error both in the granting of the motion for judgment and in the failure to admit the proffered evidence.

Insofar as the alleged error in granting judgment for the defendant is concerned, the plaintiff presents a many-pronged attack based upon various sections of the Restatement of the Law of Torts. Our attention is called to the pronouncements of our Supreme Court that, in the absence of prior decisions to the contrary, Arizona will apply the Restatement of the Law of Torts

where applicable. MacNeil v. Perkins, 84 Ariz. 74, 324 P.2d 211 [1958].

The plaintiff contends that under the evidence presented, there was a cause of action for jury determination presented under each of the following sections of the Restatement of Torts:

"§ 413. Duty to Provide for the Taking of Precautions Against Dangerous Conditions involved in Work Entrusted to Contractor.

"One who employs an independent contractor to do work which the employer should recognize as necessarily creating, during its progress, conditions containing an unreasonable risk of bodily harm to others unless special precautions are taken, is subject to liability for bodily harm caused to them by the absence of such precautions, if the employer

(a) fails to provide in the contract that the contractor shall take such precautions (as to which see § 416), or

(b) fails to exercise reasonable care to provide in some other manner for the taking of such precautions."

"§ 414. Negligence in Exercising Control Retained by Employer.

"One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for bodily harm to others, for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care."

"§ 416. Work Dangerous in Absence of Special Precautions.

"One who employs an independent contractor to do work, which the employer should recognize as necessarily requiring the creation during its progress of a condition involving a pe-

culiar risk of bodily harm to others unless special precautions are taken, is subject to liability for bodily harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions."

"§ 422. Repairs of Buildings and Other Structures on Land.

"A possessor of land who entrusts the repair of a building or other structure thereon to an independent contractor is subject to the same liability to persons within or outside the land who are injured by the contractor's negligent failure to put or maintain the building or structure in reasonably safe condition as though he had retained the making of the repairs in his own hands."

"§ 427. Negligence in Doing Inherently Dangerous Work.

"One who employs an independent contractor to do work which is inherently dangerous to others is subject to liability for bodily harm caused to them by the contractor's failure to exercise reasonable care to prevent harm resulting from the dangerous character of the work."

It is accepted by both parties that generally a contractee with an independent contractor is not liable for the negligence of the independent contractor or his employees. McGuire v. Valley National Bank of Phoenix, 94 Ariz. 50, 381 P.2d 588 [1963]; § 409 of the Restatement of Torts.

■ There is no contention other than that the relationship between the parties to the subject contract was that of owner-independent contractor. The plaintiff contends, however, that the facts of this case place it within one or more of the exceptions to the general rule. If there was substantial evidence supporting any valid theory of recovery posed by the pleadings, it was error to enter judgment notwithstanding no verdict. Vickers v. Gercke, 86 Ariz. 75, 340 P.2d 987 [1959].

The theories presented by the plaintiff have required this court to delve deep into the so-called nondelegable duties of a contractee with an independent contractor. In so doing, the court has become embroiled in a mass of case law which seems to know no end. In this mass of opinion, certain distinctions are purported to be made, and much of this has found its way into the Restatement of Torts in the sections above quoted. The author of this opinion must confess that in the context at hand, that is, when there is a question of the liability of the owner of land to an employee of an independent contractor, the purported distinctions seem confusingly blurred.

Terms such as "special precautions" [from §§ 413 and 416, supra], and "peculiar risk of bodily harm" [from § 416, supra], "inherently dangerous to others" and "dangerous character of the work" [from § 427], are fine prose but difficult to apply to actual situations so as to mark out the line between liability and nonliability. The legal tool of the independent contractor's status is one so universally prevalent in our business and industrial world that the law owes a duty to eliminate confusion in this area.

It is the opinion of this court that the Restatement of Torts leaves unresolved the question of whether or not a contractee with an independent contractor owes the duties set forth in these sections of the Restatement to an employee of the independent contractor.

Whether or not these duties apply to employees of independent contractors revolves around the meaning of the word "others" as used in the subject sections of the Restatement. The "introductory note" to Ch. 15, in which the subject sections are contained, makes this statement:

"On the other hand, in those exceptional situations, dealt with in §§ 416 to 425 inclusive, in which the employer owes a non-delegable duty to others to make the *completed work* reasonably safe, he is subject to liability for in-

jury caused by any negligence of the contractor which results in the work not being up to the required standard of safety. * * *" [Emphasis supplied]

If the duty is as to the "completed work," then we are talking about liability to adjoining property owners, tenants, business invitees, and such. Transitory conditions during construction, rather than completed work, are those that result in injuries to workers on the job.

It should be noted that § 413 of the Restatement, quoted supra, sets forth a duty which is essentially nondelegable. This is apparent in that § 413 is by its terms tied together with § 416. Though the type of risk described in these two sections is worded differently ["an unreasonable risk of bodily harm to others" as opposed to "peculiar risk of bodily harm to others"], Comment a. of § 416 states that the two risks are "of the same character." And it is also clear that if the particular risk described is present, the providing in the contract that the independent contractor shall take the necessary precautions is not sufficient to relieve liability and that the contractee remains liable if the contractor fails to exercise reasonable care to take the precautions described:

"* * * However, the fact that the contract contains express stipulations for the taking of adequate precautions and that the contractor agrees to assume all liability for harm caused by his failure to do so, does not relieve his employer from the liability stated in this Section." [Comment a. § 416]

The court considers the duties as set forth in §§ 413, 416, 423 and 427 to be of a different nature from the duty set forth in § 414. This latter duty, that of using due diligence to exercise controls actually retained, is obviously one that could have been delegated, if the contractee had chosen so to do.

Additional clues that it was not intended that these duties apply to workmen on the job can be found in the comments and illustrations under these various sections. Not one of these comments and not one of these illustrations describes or specifically pertains to the employee of an independent contractor situation, though it is obvious that if the duties described were owed to this class of persons, this would be one of the most common type of injuries covered by the duties.

One of these comments, Comment c. to § 416, gives us further indication that employees of independent contractors are not among those to whom this particular duty is owed:

"The liability imposed by the rule stated in this Section upon one who employs a contractor to take precautions for the safety of others, which the employer knows that the nature of the work will necessarily require, *is no greater than that to which the employer would be subject if he retained the taking of these precautions in his own hands*. * * *" [Emphasis supplied]

This being work obviously covered by the Workmen's Compensation Act, if the employer had retained control of the work himself, there would be no liability to employees for the type of conduct which is the subject of this action. A.R.S. § 23–1022.

This court has been supplied with Tentative Draft No. 7 of the American Law Institute pertaining to the Second Restatement of the Law of Torts [the last tentative draft prior to the draft now being published as the new Restatement]. This draft contains language very similar to the present Restatement, and uses the word "others" as does the present Restatement. The "Introductory Note" to this particular draft to Ch. 15, in which the subject sections are contained states:

"The other class of plaintiffs not included in this Chapter consists of the employees of the independent contractor. As the common law developed, the defendant who hired the contractor

was under no obligation to the servants of the contractor, and it was the contractor who was responsible for their safety. The one exception which developed was that the servants of the contractor doing work upon the defendant's land were treated as invitees of the defendant, to whom he owed a duty of reasonable care to see that the premises were safe. This is still true. See § 343. In other respects, however, it is still largely true that the defendant has no responsibility to the contractor's servants. One reason why such responsibility has not developed has been that the workman's recovery is now, with relatively few exceptions, regulated by workmen's compensation acts, the theory of which is that the insurance out of which the compensation is to be paid is to be carried by the workman's own employer, and of course premiums are to be calculated on that basis. While workmen's compensation acts not infrequently provide for third-party liability, it has not been regarded as necessary to impose such liability upon one who hires the contractor, since it is to be expected that the cost of the workmen's compensation insurance will be included by the contractor in his contract price for the work, and so will in any case ultimately be borne by the defendant who hires him.

"Again, when the Sections in this Chapter speak of liability to 'another' or 'others,' or to 'third persons,' it is to be understood that the employees of the contractor, as well as those of the defendant himself, are not included."

The foregoing is, of course, in no way authoritative, in that it has never been adopted by the American Law Institute. It is this court's understanding that the final draft of this note, now about to be published, will not contain this clear language, but will rather revert to language which leaves this basic problem unclear. But the Tentative Draft is quoted to support this court's opinion that the Restatement of Torts, which has an authoritative standing in this jurisdiction, leaves the meaning of the word "others" unclear and therefore has not spoken upon the particular subject before the court.

The case law pertaining to this question the court finds to be in irreconcilable conflict. There is reputable authority holding that these duties pertaining to inherently dangerous work, and/or work from which it is probable that there will be injury unless precautions are taken, applies to the employees of an independent contractor. Ferrel v. Safway Steel Scaffolds, 57 Cal.2d 651, 21 Cal.Rptr. 575, 371 P.2d 311 [1962]; Woolen v. Aerojet General Corporation, 57 Cal.2d 407, 20 Cal.Rptr. 12, 369 P.2d 708 [1962]; Person v. Cauldwell-Wingate Co., 176 F.2d 237 [2nd Cir.N.Y. 1949]; International Harvester Co. v. Sartain, 32 Tenn.App. 425, 222 S.W.2d 854 [1948]; Mallory v. Louisiana Pure Ice & Supply Co., 320 Mo. 95, 6 S.W.2d 617 [1928].

The weight of authority appears to be to the contrary. Corban v. Skelly Oil Company, 256 F.2d 775 [5th Cir. Ark. 1958]; Louisville & N. R. Co. v. Smith's Adm'r, 134 Ky. 47, 119 S.W. 241 [1909]; Gibilterra v. Rosemawr Homes, Inc., 19 N.J. 166, 115 A.2d 553 [1955]; Potter v. City of Kenosha, 268 Wis. 361, 68 N.W.2d 4 [1955]; Hurst, Employers Cas. Co. v. Gulf Oil Corporation, 251 F.2d 836 [5th Cir. Tex. 1958]; Hader v. Coplay Cement Mfg. Co., 410 Pa. 139, 189 A.2d 271 [1963]; Florida Power & Light Co. v. Price, 170 So.2d 293 [Fla. 1964]; Epperly v. City of Seattle, 399 P.2d 591 [Wash.1965].

This court has chosen to follow this latter view, for two reasons. Firstly, the premise upon which the liability of the contractee appears to be predicated when work is of such nature that others will probably be injured unless precautions are taken is that the contractee should not be permitted to "escape" liability by the device of a contract with an independent contrac-

tor. This can be found in the thinking of many courts, among them being our own Supreme Court in the case of S. A. Gerrard Co., Inc. v. Fricker, 42 Ariz. 503, 506, 507, 27 P.2d 678, 680 [1933], where the following was said:

"As a general rule the employer is not liable for the negligence of an independent contractor. There are, however, certain exceptions to this general rule. One of such exceptions is that the law will not allow one who has a piece of work to be done that is necessarily or inherently dangerous to escape liability to persons or property negligently injured in its performance by another to whom he has contracted such work. * * *"

As noted above, as to the employees engaged in the work to be performed, the contractee is not "escaping" liability by contracting with an independent contractor. The contractee either directly or indirectly pays Workmen's Compensation premiums. No valid reason occurs to this court to penalize the legal-industrial tool of the contract with an independent contractor, so as to increase the liability of the builder simply because this device is used. The reason for the exception to the general rule being absent, the court does not believe that the exception should pertain.

Secondly, this court believes that the distinctions being made are nebulous at best and that they become so highly confusing as to be undesirable when applied to employees of an independent contractor doing construction work.

Harper & James in their "The Law of Torts," § 26.11, Vol. 2, p. 1409, describe the line attempted to be drawn in this field of intrinsically dangerous work as a "ragged and irrational one" somewhere between two extremes. Corpus Juris Secundum has attempted to state the distinction between liability and nonliability in this area in these words:

"A substantial difference between the general rule considered supra § 584 and the exception now under consideration is that in the one case the work is of such character, that, if properly done, no injurious consequences can arise, and in the other the work is of a character from which damages are likely to arise unless precautionary measures are adopted." 57 C.J.S. Master and Servant § 590 a, p. 361.

In a job of this magnitude—fifteen to sixteen million dollars worth of construction—it would be inconceivable that there would not be injury to workmen were there not an extensive safety program having many facets. It is probably inconceivable in any event that work of this magnitude could be performed without some personal injury to the employees. Every excavation presents some danger and every construction job has certain inherent dangers. A multistory building has inherent dangers associated with the law of gravity and certain precautions must be taken to cope with these dangers or injury to employees is probable. The same can be said of most hammering, cutting, digging, welding and/or transporting equipment. And every major construction job has its own peculiar dangers arising from special jobsite factors, or the combinations of work that must be performed.

If one accepts the foregoing as the facts of life in the construction industry, then the purported distinction in the above quoted words of Corpus Juris Secundum becomes difficult to apply in the extreme. Such a pseudodistinction invites litigation at a time when our court systems are surfeited with litigation.

█ For the reasons heretofore stated, this court holds that the duties outlined in §§ 413, 416, 422 and 427 of the Restatement of Torts are not owed to employees of an independent contractor.

█ It must be clearly understood that the rule of nonliability adopted by this court is limited to the situation where the contractee has turned over safe premises to the independent contractor without hidden and/or concealed defects and has

not retained control of the premises where the work is being performed, either directly or through other independent contractors. As pointed out in the above quotation from the 7th Tentative Draft of the Second Restatement of Torts, there is a duty owed to an independent contractor and to his employees to turn over a reasonably safe place to work, or to give warning of any dangers. § 343 of the Restatement of Torts. In this case, Kennecott turned over possession of essentially innocuous real estate to a contractor and gave to that contractor the information it had pertaining to the nature of the soil in which this construction was to take place. This court holds that its duties to the employees of an independent contractor pertaining to this excavation work were delegable and that if Kennecott had delegated all control over the manner of the performance of the work to Stearns-Roger, there would have been no liability on Kennecott for this accident.

There remains only the contention of the appellant that there was sufficient evidence of control on the part of Kennecott to submit a case to the jury under the rule of law stated in § 414 of the Restatement of Torts.

■ Though the Tentative Draft, previously quoted, would relieve the contractee from this duty also, this court cannot agree that this is good law. No case law has been called to this court's attention which holds that a contractee with an independent contractor does not owe a duty to workmen on the job to prudently exercise the controls retained over the performance of the work or the jobsite. Case law appears to be to the contrary. Magnolia Petroleum Co. v. Barnes, 198 Okl. 406, 179 P.2d 132 [1946]; Besner v. Central Trust Co., 230 N.Y. 357, 130 N.E. 577, 23 A.L.R. 1081 [1921]; Raber v. Tumin, 36 Cal.2d 654, 226 P.2d 574 [1951]; C. & L. Rural Electric Cooperative Corp. v. McEntire, 216 Ark. 276, 225 S.W.2d 941 [1950].

Our Supreme Court has previously applied the law of this section to third persons. Matsumato v. Arizona Sand and Rock Company, 80 Ariz. 232, 295 P.2d 850, 56 A.L.R.2d 1385 [1956]. There is public policy involved in the elimination of causes of accidents. The division of control, particularly in the area of safety precautions, may have some tendency to cause accidents. The Court of Appeals of New York has noted this tendency in this language:

"Uncertainty regarding the division of responsibility for safety precautions between subcontractors and general contractors not only produces litigation over accidents that have happened, but is probably a prime cause of their happening in the first place." Wright v. Belt Associates, Inc., 14 N.Y.2d 129, 249 N.Y.S.2d 416, p. 420, 198 N.E.2d 590, pp. 592–593. [1964]

■ For the foregoing reasons, this court holds that the duties outlined in § 414 of the Restatement of Torts are owed by the contractee to workmen on the job, and will proceed to consider whether Kennecott retained any controls, the failure to prudently exercise which may have been a proximate cause of this accident.

During the testimony, Kennecott officials referred to this as a "turnkey" job and likened it to the situation where someone employed an independent contractor to build a house for him. To the court, these analogies are without foundation in the evidence. Under this contract, no important employee could be employed without Kennecott's approval, the salaries to be paid to all key employees were subject to Kennecott's approval, Kennecott could discharge any employee on the job, and no drawing detailing how the work was to be performed could be released to the field without prior approval by Kennecott. If Kennecott were interested only in results, many of these controls are unnecessary.

■ The argument is made that these controls were there to control cost. This is undoubtedly true, but the fallacy of the

argument is that costs and safety are inextricably related under this contract. For instance, a sloping of the banks in question would have been a cost borne by Kennecott, which additional cost might have prevented this accident. Kennecott, under this contract, was in control of whether these banks would be sloped, both through its control of the detailed drawings of the work and its control over the safety engineer, whose selection was specifically made subject to Kennecott approval and could be discharged at any time by Kennecott. The basic instability of the subject soil was well known to Kennecott and it was well qualified to draw conclusions as to whether excavations should have been sloped and/or shored. This court holds that under the facts of this case, the jury might have found that Kennecott was negligent in exercising its control over the details of the excavation work and/or over the safety program, and that such negligence was one of the causes of this accident.

This court is aware that there are decisions holding that an owner may retain general supervision and control as to the *results* of the work without becoming personally liable for the failure to exercise such controls. McDonald v. Shell Oil Co., 44 Cal.2d 785, 285 P.2d 902 [1955]; Gallagher v. United States Lines Co., 206 F.2d 177 [2nd Cir. 1953]. It is not believed that this decision is in conflict with this law. This court holds that such law should be confined to situations where power of supervision is retained so as to control the results of the work and the right to control the manner of the doing of the work is not present.

Inasmuch as there will be a subsequent trial, the other assignments of error raised by the plaintiff should be answered, for they are of the type that will arise on retrial.

As to the evidence that there was sloping and/or shoring of similar embankments on this job, this court holds that this evidence was admissible. The foundation for such was a showing from which the jury could find that Kennecott had the right to control this aspect of the job,. and that conditions were similar to the situation resulting in the bank collapse that killed Welker. Once this foundation was laid, as this court believes that it was, such testimony became pertinent as tending to show knowledge of the possible dangers involved in such embankments and a practicable means of avoiding bank failures. 65 C.J.S. Negligence § 233, p. 1050 and § 236, p. 1058; Annotation 59 A.L.R.2d 1380–1393.

The court further holds that the evidence pertaining to the consultation between Kennecott's manager and Stearns-Roger officials after the accident in question should have been admitted both for impeachment purposes and as tending to show the right of control over the safety program. While evidence of precautions taken after an accident are not admissible as an admission against interest on the issue of negligence itself, such evidence is admissible if it has any bearing on other issues in the case. Slow Development Company v. Coulter, 88 Ariz. 122, 353 P.2d 890 [1960]; Arizona Law of Evidence by Udall, § 96, pp. 151–152; Annotation 64 A.L.R.2d 1296.

As to the evidence pertaining to the sloping of the particular bank, a part of which fell upon Welker, which sloping was performed by Stearns-Roger after the accident, the court holds that this testimony might have been admitted by the trial court, but that the failure to do so was not error. The necessary foundation for such testimony was a showing from which it might be reasonably inferred that such sloping was performed by Stearns-Roger as the result of instructions received from Kennecott. If such foundation were laid, the act of sloping would have some bearing upon the issue of whether Kennecott had the right to control the details of this work, and would thus be admissible

under the law above cited. However, the evidence is unclear as to the time sequence between the meeting between Kennecott and Stearns-Roger officials, above mentioned, and the doing of this work. There being uncertainty as to this foundation, the admission or rejection of this evidence was within the discretion of the trial court.

Throop v. F. E. Young and Company, 94 Ariz. 146, 155, 382 P.2d 560 [1963].

For the reasons herein stated, the judgment rendered below is reversed and the case is remanded to the trial court for a new trial.

KRUCKER, C. J., and HATHAWAY, J., concur.