**Thomas M. CLAUSEN, Appellee,**

v.

**R. W. GILBERT CONSTRUCTION CO., INC., Appellant.**

**No. 64411.**

Supreme Court of Iowa.

Aug. 26, 1981.

Rehearing Denied Sept. 17, 1981.

**464**

Don W. Burington and Gerald M. Stambaugh of Laird, Burington, Bovard, Heiny, McManigal & Walters, Mason City, for appellant.

David E. Funkhouser of Brown, Kinsey & Funkhouser, Mason City, for appellee.

Considered by REYNOLDSON, C.J., and LeGRAND, McCORMICK, ALLBEE, and SCHULTZ, JJ.

REYNOLDSON, Chief Justice.

This appeal presents complex issues involving the duties of the defendant general contractor to the plaintiff, an employee of a subcontracting roofing company, who fell from a roof at a residential construction site. The Court of Appeals reversed a judgment entered on a jury verdict awarding damages to the plaintiff and remanded for new trial. We granted further review on both parties' applications. We now vacate the Court of Appeals decision and remand for new trial.

This record reveals defendant, R. W. Gilbert Construction Co., Inc. (Gilbert), had contracted to build a two-story porch addi-

tion to a residential property in Mason City, Iowa. Prior to his accident on November 27, 1974, plaintiff had worked one and one-half years as an apprentice roofer for Midwest Roofing Company (Midwest). Gilbert contracted with Midwest to apply a hot tar surface on the flat portion of ·a mansard roof covering the addition. This flat surface was about ten by twenty feet and abutted the roof on the west side of the existing house. On the other three sides of the flat surface were roof sections about twelve feet wide that sloped at a forty-degree angle. The ground fell away to the west, creating a drop from roof to ground level of sixteen to twenty feet.

Two days before Thanksgiving, Gilbert had erected a scaffold and started to shingle the three sloping surfaces. Before the job was finished the shingling was stopped for the holiday and the scaffolding removed. Gilbert's employees were concerned that during the long weekend moisture could penetrate the cracks between the plywood sheets covering the roof. On the night of November 26, 1974, they covered the level portion of the roof and about twelve inches of the sloping sides with a canvas to prevent moisture leakage. Gilbert then requested that Midwest replace the canvas with a temporary tar paper covering (base sheet).

Early in the afternoon on November 27, 1974, plaintiff arrived at the jobsite with Drew, superintendent of Midwest. Olson, Midwest's foreman, arrived in his own car. Drew told Olson that the flat roof and a crack eight to ten inches down on the side roofs had to be temporarily covered with base sheet to prevent leaks during the weekend. Drew testified he instructed Olson "and anybody else that was listening" not to get on the sloped roof because it was too slippery. The thirty-six-inch base sheet was to be half lapped over the mansard and nailed down "by lying on our stomachs or kneeling down."

Olson and plaintiff commenced to lay the first lap of base sheet along the west edge of the roof. Olson testified he told plaintiff to "stay away from the edge so ... you

don't fall off." Because the wind was blowing the tar paper on the end he was handling, plaintiff told Olson he was going onto the slanted portion of the roof. Olson told him to "be careful." Plaintiff and knowledgeable employees of Gilbert and Midwest agreed that the flat surface of the roof was dry and the sloping surfaces below the area which had been covered by the canvas were spotted with frost, wet, and slippery. However, in his testimony plaintiff stated, with reference to the sloping surface that he later went out on: "I checked it and it looked—felt there wasn't no—you know, it wasn't wet." Three feet down he could see "patches of frost sporadically across the whole roof."

Plaintiff then eased himself onto the mansard, "laying [sic] on [his] left hip" with his left arm on the flat surface holding down the paper. Hugo, Gilbert's representative, started to speak to plaintiff. Plaintiff turned to the right, back to the left, and then fell to the ground. He fractured both heels with resulting hospitalization, surgery, and disability.

November 18, 1976, plaintiff brought action against Gilbert. The petition alleged, inter alia, that Gilbert was negligent in failing to provide plaintiff a reasonably safe place to work and in "failing to take reasonable precautions against special dangers which were inherent in such work as plaintiff was performing when the defendant knew, or, in the exercise of reasonable care, should have known that the work of the plaintiff involved special dangers to this plaintiff." Gilbert affirmatively alleged plaintiff's contributory negligence in failing to keep a proper lookout, in leaving a position of safety and entering an obvious place of danger, in failing to take proper safety precautions, and in failing to heed warnings.

At close of evidence, plaintiff reduced his damage claim from $250,000 to $200,000. Defendant's motion for directed verdict was overruled. Defendant lodged certain exceptions to instructions that we later discuss. The jury returned a verdict for $75,-000, upon which judgment was entered.

Gilbert's posttrial motions were overruled and it appealed.

Although both parties raise numerous issues in the appeal and applications for further review, we find it necessary to determine only the following questions. (1) Was the evidence sufficient to generate a jury question under the theories of Restatement (Second) of Torts sections 413, 416, and 427, which impose liability on an employer of an independent contractor for conditions causing a "peculiar risk" or "inherent danger"? (2) Did trial court err in instructions relating to safe premises and duty to warn? (3) Was plaintiff negligent as a matter of law? (4) Upon retrial should defendant be precluded from relitigating the issue of plaintiff's contributory negligence? (5) What weight should be given to IOSHA regulations in determining whether Gilbert provided a safe place to work?

I. *Restatement (Second) of Torts Sections 413, 416, 427.*

We are concerned here with the issue whether the defendant contractor, in these circumstances, owed a duty to the plaintiff, an employee of an independent contractor. This is a legal question. *Lunde v. Winnebago Industries, Inc.*, 299 N.W.2d 473, 475 (Iowa 1980). It is undisputed that the issue was properly raised and preserved by Gilbert's trial motions, exceptions, and objections.

Sections 413, 416, and 427 of the Restatement (Second) of Torts were set out in *Giarratano v. Weitz Co.*, 259 Iowa 1292, 1307, 147 N.W.2d 824, 833 (1967), and *Porter v. Iowa Power and Light Co.*, 217 N.W.2d 221, 232 (Iowa 1974), and will not be repeated here. Nor will we reiterate the extensive analysis of these sections found in *Lunde*, 299 N.W.2d at 475–79, a decision filed after the trial in this case.

We start from the general rule that ordinarily the employer (here, the prime contractor) of an independent contractor (here, a subcontractor) is not liable for injuries arising out of the latter's negligence. *Lunde*, 299 N.W.2d at 475; Restatement

(Second) of Torts § 409 (1965); W. Prosser, Law of Torts § 71, at 468–69 (4th ed. 1971). This common-law concept is subject to many exceptions, including the sections 413, 416, and 427 situations in which an employer may be vicariously liable to "others"[1] when an independent contractor is hired to do work that is specially, peculiarly, or inherently dangerous. Restatement (Second), *supra*, §§ 413, 416, 427; *see id.* § 409, Comment (b), at 371. But an exception to these exceptions is still another general rule that ordinarily mine-run building projects are not covered by the peculiar risk doctrine. *Lunde*, 299 N.W.2d at 477; 41 Am.Jur.2d *Independent Contractors* § 43 (1968).

Although the record is clear that Midwest usually provided, and billed for, any scaffolding or safety devices required, the oral time-and-materials contract between Gilbert and this subcontractor did not require the latter to take safety precautions. Thus, the relevant Restatement sections are 413 and 427; section 416 does not apply when the employer does not require precautions "in the contract or otherwise." Restatement (Second), *supra*, § 416, Comment c.

█ Liability under section 413 requires the work to be of such a nature that "the employer should recognize [it] as likely to create, during its progress, a peculiar unreasonable risk of physical harm to others unless special precautions are taken." *Id.* § 413. We have said, with reference to sections 416 and 427, that the required danger must be inherent in the work when properly done, and that the danger is not inherent unless it attends the normal and usual method of doing the work. *Lunde*, 299 N.W.2d at 476 (quoting Restatement (Second), *supra*, § 416, Comment e); *Porter*,

217 N.W.2d at 233 (construing Restatement (Second), *supra*, §§ 416, 427). The "peculiar risk" exception is not concerned with "the taking of routine precautions, of a kind which any careful contractor could reasonably be expected to take, *against all the ordinary and customary dangers which may arise in the course of the contemplated work.*" Restatement (Second), *supra*, § 413, Comment b (emphasis added). In *Lunde* we recognized that the element of foreseeability must be present to allow recovery; the danger or risk must be foreseeable by the employer "in the normal conduct of the operation." 299 N.W.2d at 476 (quoting Smith, *Collateral Negligence*, 25 Minn.L. Rev. 399, 428 (1941)).

█ Examining this record in the light most favorable to plaintiff, we find no evidence that this risk, in the normal conduct of the work, was foreseeable by Gilbert. The night before this accident Gilbert had covered the flat portion of the roof and a twelve-inch overlap with canvas. The result was a dry working area. Several experts, including plaintiff's superintendent, testified a "workmanlike" and "normal" manner in which to cover the crack in the slanting portion of the mansard roof would be to hold down the tar paper by lying or kneeling on it on the flat surface, and then lapping it over and nailing it down about twelve inches below the edge. Midwest's superintendent Drew had so instructed the foreman Olson and expected him to convey the order to plaintiff. Plaintiff testified he thought it was important to keep himself on the flat surface of the roof "because it's not very hard to slip on plywood decking, especially that's on a slope," but a strong wind prompted him to go over the side to better

---

1. This defendant, unlike the defendant in *Lunde*, see 299 N.W.2d at 475 n.2, does not ask us to reexamine our holding in *Giarratano* that an employee of an independent contractor is one of the "others" protected by Restatement (Second) section 416. *See also* Bramer v. United States, 595 F.2d 1141, 1144–46 (9th Cir. 1979) (relying on New Mexico Elec. Serv. Co. v. Montanez, 89 N.M. 278, 551 P.2d 634 (1976)); Olson v. Kilstofte and Vosejpka, Inc., 327 F.Supp. 583, 587–88 (D.Minn.1971), *aff'd per curiam sub nom.* Olson v. Red Wing Shoe Co.,

456 F.2d 1299 (8th Cir. 1972); Eutsler v. United States, 376 F.2d 634, 635–37 (10th Cir. 1967); State v. Morris, 555 P.2d 1216, 1220–21 (Alaska 1976); Welker v. Kennecott Copper Co., 1 Ariz. App. 395, 401–04, 403 P.2d 330, 336–39 (Ct. App.1965); King v. Shelby Rural Elec. Coop. Corp., 502 S.W.2d 659, 661–63 (Ky.1973), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 235 (1974); Donch v. Delta Inspection Servs., Inc., 165 N.J.Super. 567, 571–75, 398 A.2d 925, 928–29 (1979).

hold down his end of the base sheet. Gilbert's employee on the job, Hugo, testified he was "surprised" when he observed plaintiff had gone over the edge and tried to warn him not to do so.

Drew, responding to generalized questions on cross-examination, testified a worker might go down on an adjoining pitched roof to nail an eighteen-inch overlap, "if it isn't too steep." Hugo responded in a similar vein. However, these questions addressed a hypothetical situation in which nails were to be inserted eighteen inches below the flat surface. Here the nailing was required below a crack only eight to ten inches from the flat surface. When plaintiff fell, Olson was kneeling on the other end of the base sheet strip on the flat surface and nailing about ten inches down on the mansard. Plaintiff asserts a strong wind required his bizarre maneuver, but we cannot conceive that a determination whether construction work is likely to create a peculiar unreasonable risk should turn on the hour-to-hour force and direction of the wind. To be an inherently dangerous activity, the danger must inhere "in the activity itself *at all times*, whether or not carefully performed." *Rodriques v. Elizabethtown Gas Co.*, 104 N.J.Super. 436, 445, 250 A.2d 408, 413 (1969) (emphasis added). Gusts of wind do not rise to a section 413 "peculiar risk," but require "routine precautions, of a kind which any careful contractor could reasonably be expected to take." Restatement (Second), *supra*, § 413, Comment b.

Plaintiff assigns importance to the fact that later in the day Midwest's workers used toeboards to descend the slanting roof areas to cover another crack that was four feet below the top crack. But plaintiff admittedly was not engaged in that activity when he fell, and he testified he had not then seen the lower crack.

On its facts this case is controlled by *Lunde* and not *Giarratano*. Nothing in this record persuades us this work was so inherently dangerous that, as a matter of public policy, we should declare it nondelegable

and allow a jury to consider Gilbert's vicarious liability. The issue of Gilbert's liability under this doctrine was submitted erroneously to the jury. Insofar as it affirms trial court's rulings in this respect, the Court of Appeals decision must be vacated. This holding makes it unnecessary to analyze Gilbert's claim that a "collateral negligence" issue was raised.[2]

## II. *Instructions on Safe Premises and Duty to Warn.*

■ Trial court's Instruction 8 informed the jury that Gilbert as general contractor had a duty to use ordinary care to provide plaintiff with a safe place to work and that a failure in this regard would be negligence.

Gilbert on appeal claims "reversible error was committed by the failure of the Court to instruct that an obligation to keep the premises reasonably safe is also satisfied by giving warning of any latent dangers." Plaintiff asserts this alleged error was not preserved by appropriate objections below. The Court of Appeals held the error was preserved and that trial court erred in failing to instruct on the duty to warn.

Gilbert's exceptions to Instruction 8 should have been sufficiently clear to alert trial court to the contention now advanced in order to provide an opportunity to correct the alleged error before the case went to the jury. *Lockhard v. Carson*, 287 N.W.2d 871, 873 (Iowa 1980); *Wambsgans v. Price*, 274 N.W.2d 362, 365 (Iowa 1979). However, Gilbert's exceptions to this instruction were too generalized (*e. g.*, "no sufficient evidence," "imposes greater burden than is provided by law," "misstatement of the law") to meet the standard required to preserve the asserted error.

Although the Court of Appeals should not have reversed on this ground, the case, nevertheless, must go back for retrial because we cannot assume the plaintiff's verdict did not rest on the ground discussed in division I. Upon retrial, instructions relating to Gilbert's duties to protect plaintiff as a business invitee should follow the princi-

---

**2.** Collateral negligence is explained in Restatement (Second), *supra*, §§ 426, 427, Comment d.

ples articulated in *Mundy v. Warren*, 268 N.W.2d 213, 215–18 (Iowa 1978); *Greenwell v. Meredith Corp.*, 189 N.W.2d 901, 905–06 (Iowa 1971); and *Giarratano*, 259 Iowa at 1308–09, 147 N.W.2d at 834.

### III.  *Other Asserted Errors.*

We deal briefly with other claimed errors to the extent they may arise again.

■ On the record in this trial, we hold trial court was right in refusing to hold plaintiff contributorily negligent as a matter of law.  *See* Iowa R.App.P. 14(f)(10). Because the case may be resubmitted to a jury on different instructions, we are not persuaded by plaintiff's arguments that Gilbert should be precluded from relitigating his alleged contributory negligence.

■ This record does not contain sufficient evidence to warrant awarding damages for plaintiff's future medical expenses, *see Stanley v. State*, 197 N.W.2d 599, 606–07 (Iowa 1972), nor are we convinced by plaintiff's argument that submission of this issue to the jury was harmless error.

■ Finally, we hold, as we did in *Lunde*, 299 N.W.2d at 478, that alleged IOSHA violations may not be applied to enlarge or diminish any common-law or statutory rights or duties of employers or employees. The federal occupational safety and health standards were adopted in Iowa pursuant to the provisions of chapter 88, The Code. This chapter includes section 88.20:

> Nothing in this chapter shall be construed to supersede or in any manner affect any workers' compensation law or to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment.

Federal decisions rely on 29 U.S.C. § 653(b)(4), the comparable federal statute, in holding an OSHA violation does not create a private cause of action in favor of a nonemployee of the alleged violator.  *See, e. g., Jeter v. St. Regis Paper Co.*, 507 F.2d

973, 976–77 (5th Cir. 1975); *Russell v. Bartley*, 494 F.2d 334, 335–36 (6th Cir. 1974). In short, these standards cannot be used to abrogate the independent contractor immunity doctrine.

If common-law or statutory rights or duties do exist between parties, however, violation of an IOSHA or OSHA standard by an employer is negligence per se as to an employee and is evidence of negligence as to persons who are likely to be exposed to injury as a result of the violation.  *Koll v. Manatt's Transportation Co.*, 253 N.W.2d 265, 270 (Iowa 1977); *cf. Jorgensen v. Horton*, 206 N.W.2d 100, 102–03 (Iowa 1973) (industry safety codes); *see generally* Annot., 79 A.L.R.3d 962 (1977); Case Note, 27 Drake L.Rev. 178 (1977–78).

We vacate the Court of Appeals decision and remand to district court for new trial in conformance with this opinion.

DECISION OF COURT OF APPEALS VACATED; REMANDED WITH DIRECTIONS.