**Ronald Douglas OXFORD and James C. Daniel, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**UNITED STATES of America, Third-party Plaintiff,**

v.

**JESSE CRAIG, INC., Third-party Defendant.**

**No. CIV 87–1845 PHX EHC.**

United States District Court, D. Arizona.

Sept. 27, 1991.

Steven J. Kuehl, Van O'Steen and Partners, Phoenix, Ariz., for Ronald Douglas Oxford and James C. Daniel.

John R. Mayfield, U.S. Atty., Phoenix, Ariz., for U.S.

Douglas Thomas, Junker and Doherty, P.C., Phoenix, Ariz., for Jesse Craig, Inc.

## ORDER RE: MOTION TO DISMISS AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

CARROLL, District Judge.

### FINDINGS OF FACT

1. This is a personal injury action instituted by the plaintiffs against the United States under authority of the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671, *et seq.* and 28 U.S.C. § 1346(b). Subsequent to the filing of plaintiffs' complaint, the defendant, pursuant to Fed.R.Civ.P. 14, brought a complaint against plaintiffs' employer, Jesse Craig, Inc., seeking indemnity for the negligence of the employer.

2. The plaintiffs were injured on the job when a ladder on which they were working inside of a water tank derailed and they were thrown to the bottom of the tank. Plaintiffs sustained serious injuries.

3. On March 15, 1987, plaintiffs were applying primer paint to the interior roof of Tank 724 at Williams Air Force Base. Tank 724 is a 500,000 gallon steel water tank, with an overall height of approximately 140 feet. The diameter is approximately 50 feet and the total interior height of the water containment unit is approximately 47 feet.

4. Pursuant to the contract between the government and Jesse Craig, Inc., the inside of the tank was to be sandblasted, primed, then painted; each element of the work was to be inspected before the contractor continued with the next consecutive work element. The contractor personnel were to request these inspections as they finished each phase, and the government was not obligated to provide an inspector to routinely observe the workmen. In fact, an inspection was not requested at each stage; the plaintiffs testified that the government inspectors trusted their work and frequent inspections were not necessary. The plaintiffs both testified that the work in Tank #724 was inspected only once or twice.

5. The plaintiffs were utilizing a steel, arched, rotating ladder inside the tank as a work platform. The top of the ladder was attached to a center pivot point at the top of the water tank. The base of the ladder was attached by 7-inch cast-iron pulley wheels to a T-shaped track which was located approximately half-way from the floor of the tank. The track was four inches wide and the T portion of the track was four inches high and ¼ inch thick. The two upper weight-bearing wheels rode on the top of the T-portion of the track and the two lower wheels ("keeper wheels") were designed to engage the track to prevent a derailment. All four pulley wheels were attached to the ladder frame through the use of 7-inch long, 1-inch diameter stainless steel bolts. Each pulley wheel revolved on a stainless steel bushing. These bushings prevented direct contact between the pulley wheel and the axle bolts. The axle bolts were secured to a ½ inch steel plate by a washer and a square nut which were welded to the steel plate. A jam nut was then secured against the welded nut.

6. Before the accident, the government authorized structural repairs to the ladder which were performed by Jesse Craig, Inc. These repairs included replacement of the upper pivot point pin, ladder rungs, and ladder frame repairs. It is not contended by the plaintiffs that these pre-accident repairs caused or contributed to the accident. On or about February 23, 1987, the approved repairs to the ladder were inspected by Mr. Michael Sergeant in order to ensure that the contractor properly performed the authorized repairs.

7. There is a dispute regarding whether the plaintiffs were authorized to use the ladder as a work platform. Government Inspector John Painter testified that prior to the accident, he had orally advised Mr. Daniel that the contractor was not to use the rotating ladder as a work platform. On February 24, 1987, Mr. Painter again advised that the ladder was *not there for the benefit of the contractor.* (Daily Inspection Record report #25, Exhibit 44.)

8. On the other hand, Jesse Craig testified that he assumed that they were allowed to use the ladder as a platform. The ladder appeared in the drawings in the bid

package, and Jesse Craig relied on its use when he submitted his bid.

9. In any event, plaintiffs did utilize this ladder as a work platform. In order to paint the entire interior roof of the tank, the plaintiffs needed to move the ladder around the track. They had been experiencing problems in moving the ladder; the ladder had been alternately submerged in water and exposed to air since the tank had been constructed in 1942 and it was substantially corroded, despite the presence of anodes which provided corrosion protection for the interior of the tank. When the plaintiffs experienced difficulty in moving the ladder to the next area of the tank, they would attach a "come-along"—a winch—to the track approximately four feet in front of the current position of the ladder, and hook it to the ladder. They would then mechanically pull the ladder to the position of the come-along. Two come-along devices were at the accident site.

10. At approximately 4:30 p.m. on March 15, the plaintiffs were manually pushing the ladder to the next position of the track when it derailed. The plaintiffs testified that they were not using a come-along to pull the ladder at the time of the derailment. When the ladder derailed, the plaintiffs were thrown off of the track and fell approximately 40 feet to the floor of the tank, suffering serious injuries. At the time of the accident, the plaintiffs' safety belts were not tied off to anchor points and they were not using safety lines or safety nets.

11. The contract between the Department of the Air Force and Jesse Craig, Inc. consisted of two written documents: the government specifications dated July 31, 1985 (Exhibit 21) and the Solicitation, Offer, and Award (Exhibits 22). These outlined the contractor's duties to provide the proper equipment and to provide a safe work place.

12. A preconstruction conference was held on May 5, 1986 after the award of the contract to Jesse Craig, Inc. The memorandum from this conference (Exhibit 27) states that the contractor was briefed on the importance of complying with OSHA regulations; Mr. Rosales and Mr. Craig testified that the contractor was briefed on the importance of insuring full compliance with all safety regulations due to the extreme heights involved in the project.

13. Plaintiffs allege two design defects. First, plaintiffs' expert witness, Dr. Dean Jacobsen, testified that the ladder wheels were not positioned tangent to the circular track which caused the upper wheels to climb the track and ultimately derail. Although he testified that while the original 1941 design was appropriate and provided for tangential wheels, the ladder was not erected according to the original design.

14. Second, Dr. Jacobsen testified that there was a loss of "capture" between the track and the keeper wheels due to a downward cant of the track and elastic deformation of the wheel axles which permitted the upper wheels to climb the track in spite of the lower keeper wheels. Dr. Jacobsen based his testimony on his study of photographs and videotape taken of the ladder and track, on blueprints, and on the deposition testimony in the case. He did not inspect the ladder or take any measurements as the ladder was submerged at the time he was retained.

15. Defendant United States' expert witness, Mr. Charles Bartlett, conducted two inspections of the ladder and water tank. He concluded that there was no design defect present in the original design of this ladder or as constructed. Although he agreed the upper pulley wheels might have a tendency to ride up on the track, he felt that an acceptable substitute design was incorporated to prevent derailments. First, each upper pulley wheel carried a load of 304 pounds which would tend to defeat the tendency of the upper wheels to climb. Second, the design of the keeper wheel system would prevent derailment even under such circumstances. A lower pulley wheel introduced into evidence (Exhibit 117) exhibited scraped paint, signs that the keeper wheels had at some time worked as designed. Third, the pivot pin at the top of the tank moved to compensate for any lateral movement by the wheels.

16. Further, Mr. Bartlett contested Dr. Jacobsen's analysis that there was insufficient capture. Mr. Bartlett measured the cant of the track and found a four degree variation; he testified that this was "surprisingly accurate" and not sufficient to allow clearance of the wheels. Further, Mr. Bartlett disagreed that elastic deformation of the wheel axles would permit the upper wheels to climb the track in spite of the lower keeper wheels. He testified that his computer model reflected that the structural integrity of the ladder would be maintained with up to 500 pounds on the ladder, and that it would require a force of 29,000 pounds to deform the axles ¼ of an inch so that the ladder could derail. Further, he testified that if there were elastic deformation, there would be evidence of that, such as bending of bolts or bowing of the plates to which the wheels are mounted.

17. This Court will accept the testimony of Mr. Bartlett based on his rigorous computer analysis of the stresses on the ladder and examined the ladder in person. Dr. Jacobsen performed only a limited analysis of the ladder based on photographs and the blueprints.

18. Mr. Bartlett hypothesized that a possible cause of the accident was that a come-a-long was used at the time of the accident to create enough force to derail the ladder. However, both Mr. Bartlett and Dr. Jacobsen testified that if the come-along had been attached at the time of the accident, there would have been damage to either the track or the come along due to the force of the ladder derailing. Further, both plaintiffs testified that they were not using a come-a-long at the time of the accident.

19. Mr. Bartlett opined that an alternative cause of the derailment was due to the removal of jam nuts from the upper wheel axles, which resulted in the extension of the axle bolts. The absence of the jam nuts would have placed the lower keeper wheels out of contact with the track, making the ladder easier to move but defeating the keeper wheel purpose of preventing derailment. Dr. Jacobsen agreed that if the jam nuts were removed and the upper axle bolts extended, this would increase the risk of a derailment.

20. Pictures taken of the ladder after the accident (Exhibit 82N) revealed an area of corrosion in the shape of the jam nuts which was not covered with paint, indicating that the jam nuts were either removed or fell off sometime after the last painting had been conducted in Tank 724. The plaintiffs testified that they did not remove any bolts or nuts from the ladder wheels, and there is no direct evidence—other than the photographs—to the contrary. The nuts could have conceivably fallen off during the derailment or have been removed after the accident when the ladder was reassembled. However, this is highly unlikely, given Mr. Bartlett's testimony that it would have been exceedingly difficult to take the bolts off without a wrench, and the nuts were necessarily missing at the time of the accident (assuming a come-along was not used to pull the ladder, the absence of these nuts would make the ladder easier to move than usual), the most probable explanation is that the plaintiffs or their co-workers removed the nuts to loosen the bottom keeper wheels in order to facilitate the movement of the ladder. No other explanation is consistent with all of the evidence.

## CONCLUSIONS OF LAW

### Design defect:

1. Defendant United States moves to dismiss plaintiffs' claims that the Department of the Air Force was negligent in the design and manufacture of the ladder in question. The defendant argues that this Court does not have jurisdiction over these allegations because the Department of the Air Force did not design the ladder and because plaintiffs failed to file an administrative claim with the Army Corps of Engineers, the governmental entity involved in the design of the ladder. *Holloman v. Watt*, 708 F.2d 1399, 1401–02 (9th Cir. 1983).

2. Exhibit 14 establishes that in 1941, the United States Army Corps of Engineers awarded a contract for the construction of Mesa Military Airport (now

Williams Air Force Base) to the Darby Corporation of Kansas City, Kansas. The Darby Corporation was responsible for the design, fabrication and erection of the rotating ladder in Tank 724. Exhibits 92 and 93 show that the Army Corps of Engineers approved the Darby Corporation design drawings on August 5, 1941, and issued its final acceptance of elevated Tank 724 on July 9, 1942. (Exhibit 115). The Department of the Air Force did not come into legal existence until passage of the National Security Act of 1947.

3. Plaintiffs filed administrative claims with the Department of the Air Force in June and July, 1987, and thereafter pursued their lawsuit in November, 1987. The plaintiffs did not file administrative claims with the Army Corps of Engineers, and thus cannot pursue litigation against the Corps of Engineers.

4. Plaintiffs argue that the defendant is estopped from arguing that the Department of the Air Force did not design the ladder. Defendant's verified answers to interrogatories dated June 21, 1988, stated that Russel V. Sinclair of the Department of the Air Force designed the ladder in 1956, and that William F. Killian of the Air Force also was involved in its design. The first time the plaintiffs were informed by the defendant that the Army Corps of Engineers, and not the Air Force, approved the design of the ladder in 1941 was in August, 1989. However, the limitations period for pursuing administrative remedies and joining the Army Corps of Engineers as a defendant had passed on March 15, 1989.

5. This Court finds that the United States is estopped from arguing that the Department of the Air Force did not design the ladder, and the defendant's motion to dismiss will be denied.

6. This Court finds that the plaintiffs have not sustained their burden of proof with regard to the existence of a design defect. Although the angle of the wheels on the ladder was not tangent, the design incorporated the keeper wheels as a safety feature to prevent derailment. This Court finds from all of the evidence that the plaintiffs or their co-workers removed or loosened the jam nuts to the bottom keeper wheels in order to facilitate the movement of the ladder. This prevented the keeper wheels from functioning as intended, defeating the safety mechanisms incorporated into the design of the ladder.

*Failure to provide a safe workplace:*

1. The FTCA holds the United States liable for certain torts "in the same manner and to the same extent as private individuals under like circumstances," 28 U.S.C. § 2674, "in accordance with the law of the place where the act of omission occurred." 28 U.S.C. § 1346(b). As the injuries complained of occurred in Arizona, Arizona law applies. *Gardner v. United States,* 780 F.2d 835, 837 (9th Cir.1986).

2. The responsibility for safety on the job was delegated to Jesse Craig, Inc., the independent contractor. Jesse Craig testified that he had the sole responsibility for providing a safe workplace. The contract delegated that responsibility to the contractor: Clause 1.03(I) states that the contractor must "enforce accident prevention requirements." Specific safety requirements were not listed.

3. Generally, an employer is not liable for the negligence of an independent contractor resulting in injury to others. *Ft. Lowell—NSS Ltd. Partnership v. Kelly,* 166 Ariz. 96, 800 P.2d 962 (1991), *citing, E.L. Jones Constr. Co. v. Noland,* 105 Ariz. 446, 454, 466 P.2d 740 (1970); Restatement §§ 410–415. However, exceptions to this rule have been recognized.

4. If the owner of the land or general contractor "retains control" over the method and manner in which a project is performed by an independent contractor, the owner/general contractor's duty to ensure the safety of the employees of the independent contractor is non-delegable. *Silvas v. Speros Constr. Co.,* 122 Ariz. 333, 594 P.2d 1029 (App.1979); *Pruett v. Precision Plumbing, Inc.,* 27 Ariz.App. 288, 554 P.2d 655 (App.1976); *Mason v. Arizona Public Service Co.,* 127 Ariz. 546, 622 P.2d 493 (App.1980); *Rashley v. Wilcox,* 160

Ariz. 321, 772 P.2d 1174 (App.1989).[1] To fall within this exception, the owner/general contractor's retention of general supervisory authority to direct the sequence of work or prescribe alterations is not sufficient; the owner/general contractor must be able to control the method or manner of the *details* of the work. *Koepke v. Carter Hawley Hale Stores, Inc.,* 140 Ariz. 420, 682 P.2d 425 (App.1984). *See also* Restatement (Second) of Torts § 414.[2]

5. Defendant moves to dismiss plaintiffs' claim that the government was negligent in providing a safe workplace, based on the Air Force's failure to retain control of the project. It is clear that the Air Force did not retain control over the manner and method of performance of the contract.

6. Plaintiff James Daniel testified that he did not receive instructions from government inspectors regarding the method of his work, and saw a government inspector inside Tank 724 on only one or two occasions. Plaintiff Ronald Oxford also testified that he did not receive instructions from government instructors and only saw inspectors inside the tank once or twice. The contract only provides specification for the results required, and does not detail the manner in which the work should be performed.

■■■ 7. Defendant's motion to dismiss on the issue of retained control will be granted. The fact that the government required a safety program, reserved the right to inspect, and retained the right to stop work for safety violations is insufficient to impose liability. *Roberson v. United States,* 382 F.2d 714 (9th Cir.1967);

*United States v. Page,* 350 F.2d 28 (10th Cir.1965); *Kirk v. United States,* 270 F.2d 110 (9th Cir.1959). The government did not retain control over the day-to-day operations of the independent contractor. *Letnes v. United States,* 820 F.2d 1517 (9th Cir.1987).

8. Plaintiffs also allege that defendant is liable for its failure to ensure that the ladder on which plaintiffs were working was safe. Essentially, plaintiffs urge that defendant be held liable for failing to maintain a safe place to work for its business invitees. A land possesser has a non-delegable duty to keep his premises reasonably safe for invitees. *Ft. Lowell,* 800 P.2d at 967. *See Martinez v. Asarco Incorporated,* 918 F.2d 1467 (9th Cir.1990) (question of material fact existed as to whether an owner had breached the duty owed to an invited independent contractor's employee to warn of any danger on the premises).

■■■ 9. Plaintiffs' injuries in this case were not caused by dangerous conditions of the premises of which the defendant had a duty to warn. The ladder was not defective, and the ladder had been repaired to ensure that it did not impose a danger to the workers by falling from its pivot point in the ceiling. The harm was instead caused by the failure of the independent contractor and the plaintiffs to take reasonable precautions for working forty feet above the floor of the water tank and by the removal of the jam nuts. The work was dangerous, not the premises, and the defendant could be held liable for plaintiffs' failure to take reasonable safety precautions only if it retained sufficient con-

1. Another exception to the general rule is where an independent contractor performs inherently dangerous work, the employer is liable for the contractor's failure to exercise reasonable care. *See* Restatement (Second) of Torts, §§ 416, 427. However, the plaintiffs do not assert this basis for liability and Arizona has not extended this liability to cover injuries to the employees of independent contractors. *Parks v. Atkinson,* 19 Ariz.App. 111, 505 P.2d 279 (App.1973); *Basurto v. Utah Constr. & Mining Co.,* 15 Ariz.App. 35, 485 P.2d 859 (App.1971); *Welker v. Kennecott Copper Co.,* 1 Ariz.App. 395, 403 P.2d 330 (App. 1965). Where state law does not impose a non-delegable duty owed to a contractor's employee,

this Court cannot do so. *Littlefield v. United States,* 927 F.2d 1099 (9th Cir.1991) (Nevada law does not impose liability for injuries to employees of independent contractor under the inherently dangerous theory).

2. Restatement (Second) of Torts, § 414 states:

One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

trol of the project, which this Court has found it did not do.

10. Because this Court finds that the harm did not result from any unsafe condition of the premises, it is unnecessary to address whether any danger was open and obvious to the plaintiffs.

■ 11. Further, the plaintiffs did not introduce sufficient evidence that the United States was aware that it was using the ladder as a work platform. The government inspector testified that he warned Jesse Craig, Inc. and its employees that the ladder was not to be used in performing this project, and the contract specifically stated that the government was not furnishing any items for the contractor's use. The plaintiffs did not introduce any direct evidence to show that the government inspectors were aware that the contractor's employees were utilizing the ladder as a work platform.

12. The defendant United States is not liable on any theory of failure to maintain a safe premises or to ensure that the ladder on which plaintiffs were working was safe.

13. Because this Court finds no liability on the part of the defendant United States, the United States' third-party claim against Jesse Craig, Inc. will be dismissed.

The foregoing constitute the findings of fact and conclusions of law with respect to this action.

Accordingly,

IT IS ORDERED that the defendant United States' Motion to Dismiss is granted in part and denied in part, in accordance with the terms of this order.

IT IS FURTHER ORDERED that the United States' third-party claim against Jesse Craig, Inc. is hereby dismissed.

IT IS FURTHER ORDERED that judgment in favor of the defendant United States be entered in accordance with Fed. R.Civ.P., Rule 54, the plaintiffs to take nothing by way of their complaint.